In the Matter of the Estate of JOSEPH PULITZER, Deceased.[*]

Surrogate's Court, New York County, February 26, 1931.

*Jackson, Fuller, Nash & Brophy* [*John G. Jackson* and *Stephen P. Nash* of counsel], for Ralph Pulitzer, Joseph Pulitzer, Jr., and Herbert Pulitzer, individually, and as directors of the Press Publishing Company.

*Rogers H. Bacon*, for the petitioners as trustees.

[*] See, also, 140 Misc. ——.

*Vincent L. Leibell*, special guardian for certain male infants.

*Thomas I. Sheridan*, special guardian for certain female infants.

*Max D. Steuer*, for Paul Block, by permission of the court.

*Jenks & Rogers* [*Gustavus A. Rogers* of counsel], for James W. Barrett and Foster Gilroy in their own behalf and in behalf of certain editors, managers and employees of the *World*, by permission of the court.

FOLEY, S. This is a proceeding for the judicial settlement of the accounts of the trustees of a certain trust under the will of Joseph Pulitzer. The trustees also seek a construction of the will and codicils and particularly of a certain article of a codicil which relates to that trust. They request the advice and direction of the surrogate. They also seek the instructions and determination of the court as to the propriety, price, manner and time of sale of a substantial portion of the assets of the Press Publishing Company, the stock of which constitutes a material part of the assets of the trust here involved. They request the approval of the contract for such sale dated January 31, 1931, and a supplemental contract dated February 14, 1931. A serious and imperative emergency is claimed to exist, whereby, if such a sale is not made, a valuable asset of the trust estate may be in great part or wholly lost to the trust, the life tenants and remaindermen.

At the very outset, the functions and duties of the surrogate in this situation should be made clear. There are four questions to be determined by me as follows:

(a) Regardless of any prohibition or limitation contained in the will and codicils, have the trustees, in the present exigency, power and authority to sell the assets of a company, the stock of which is included in the trust?

(b) If a prohibition is contained in the will, has the Surrogate's Court, under its equitable jurisdiction, the power to modify the terms of the trust and authorize the sale of such assets by the trustees?

(c) Do the proofs submitted to the surrogate justify the exercise of that power in the emergency?

(d) A fourth question is presented, which will be considered in the secondary part of this decision. Has the surrogate the legal power to approve the contract and supplemental contract and the specific terms of the proposed sale of the assets by the Press Publishing Company?

(1) In answer to the first three questions I hold that the trustees, as the representatives of the estate, have the power and general authority to participate as corporate officers and holders of the

estate stock in the sale of the property of the company, and that the equitable powers of the Surrogate's Court should be invoked to generally authorize them to make such a sale. I hold further that there is an implied power of sale in the will, which, in the present crisis, may be exercised by the trustees. I hold further that the proofs presented to me as to the financial condition of the Press Publishing Company, its diminishing assets and increasing loss of revenue in its business operations, create a duty in the trustees to act for the protection of the beneficiaries of the trust.

As to the fourth question, I am firmly of the opinion and hold that the Surrogate's Court entirely lacks the power to approve the specific terms of the contract, submitted here, for the sale of the assets by the Press Publishing Company to the Consolidated Newspaper Corporation, because this court has no jurisdiction over the internal affairs of a corporation, the stock of which is owned in part by an estate and in part by stockholders in their individual right or title. In other words, general authority will be granted to the trustees and power is found to exist for them to exercise such authority. But the responsibility for the selection of the purchaser, the details of the transaction, the selling price, the terms of payment and the credit of the purchaser rest upon the officers and directors of the corporation.

Joseph Pulitzer died in the year 1911. He left a will and four codicils which were admitted to probate by this court on November 29, 1911. The provisions directly pertinent to the issues here are contained in the first codicil, which is dated March 23, 1909. By its terms he gave the shares of the capital stock of the Press Publishing Company, which were owned by him, and his shares of the Pulitzer Publishing Company of St. Louis in trust for the life of each of the two youngest of his sons, Joseph Pulitzer, Jr., and Herbert Pulitzer. The period of the two lives mentioned was defined by him as the "trust term." There were directions to pay the income in certain fractional shares to his three sons and to certain other persons. Further provisions were made for payment to the male descendants of the sons in case of the death of any of the sons during the "trust term." Upon the expiration of the "trust term" there was a direction to divide the said stock under varying conditions. If one of the sons survives, he is to take "the shares of stock of said Companies" held for his benefit and the remainder is to be divided among the male descendants of his sons and daughters. Certain other provisions for the vesting of the remainders and for gifts over are contained, which are not important here.

To distinguish it from the residuary trust, the particular trust here has been called the "Newspaper Trust." Its trustees are the testator's three sons, Ralph Pulitzer, Herbert Pulitzer and Joseph Pulitzer, Jr. The Pulitzer Publishing Company publishes the St. Louis *Post Dispatch*. The Press Publishing Company publishes the New York *World*, the *Sunday World* and the *Evening World*. The trustees of the so-called "Newspaper Trust" hold within the trust a very large majority of shares of the Press Publishing Company. The remaining shares are owned by the trustees individually. The paragraph particularly sought to be construed here, which deals with the powers of the trustees and the limitations thereon, is contained in article 7 of the codicil of March 23, 1909, and reads as follows: "I further authorize and empower my Executors and Trustees to whom I have hereinbefore bequeathed my stock in the Pulitzer Publishing Company of St. Louis, at any time, and from time to time, to sell and dispose of said stock, or any part thereof, at public or private sale, at such prices and on such terms as they may think best, and to hold the proceeds of any stock sold in trust for the beneficiaries for whom such shares were held in lieu thereof, and upon the same trusts. This power of sale is not to be construed as in any respect mandatory, but purely discretionary. This power of sale, however, is limited to the said stock of the Pulitzer Publishing Company of St. Louis, and shall not be taken to authorize or empower the sale or disposition under any circumstances whatever, by the Trustees of any stock of the Press Publishing Company, publisher of 'The World' newspaper. I particularly enjoin upon my sons and my descendants the duty of preserving, perfecting and perpetuating 'The World' newspaper (to the maintenance and upbuilding of which I have sacrificed my health and strength) in the same spirit in which I have striven to create and conduct it as a public institution, from motives higher than mere gain, it having been my desire that it should be at all times conducted in a spirit of independence and with a view to inculcating high standards and public spirit among the people and their official representatives, and it is my earnest wish that said newspaper shall hereafter be conducted upon the same principles."

There are fifteen remaindermen in existence. One of them is an adult, the other fourteen are infants. Because of a possible adversity of interest, they are represented here by two separate special guardians. The adult life tenants and remainderman join in requesting the relief sought by the trustees.

Counsel for the trustees contend that the express denial of a power of sale contained in the paragraph was modified and cut down, as a matter of testamentary intent, by Mr. Pulitzer in its subse-

quent language, wherein he expressed his desire and his earnest wish as to the perpetuation of the paper and the standards and ideals for its management by his sons and their descendants. They contend further that the instructions to " my sons and my descendants " indicated a definite differentiation of Mr. Pulitzer's purpose to guide them in their individual capacity rather than in their duties as trustees. They also contend that the prohibition was against disposal of the stock and not of the assets of the company. There is some support to be found in the provisions of the will for these contentions. Indication of an intent to authorize a sale in certain emergencies is thus found in article 6 of the codicil dated May 11, 1910.

But I prefer to place my determination here upon broader grounds and upon the power of a court of equity, in emergencies, to protect the beneficiaries of a trust from serious loss, or a total destruction of a substantial asset of the corpus. The law, in the case of necessity, reads into the will an implied power of sale. The law also assumes that a testator had sufficient foresight to realize that securities bequeathed to a trustee may become so unproductive or so diminished in value as to authorize their sale where extraordinary circumstances develop, or crisis occurs. Such was the law in this State prior to the making of Mr. Pulitzer's will. He is charged with knowledge of it. It was laid down in the leading case of *Toronto Gen. Trusts Co.* v. *C., B. & Q. R. R. Co.* (64 Hun, 1; affd. on opinion below, 138 N. Y. 657). It was again applied by Chief Judge CARDOZO in *Mertz* v. *Guaranty Trust Co.* (247 N. Y. 137, 144). "A trustee finds upon his hands an investment, mandatory in its origin, but so changed as to be no longer mandatory, even if permitted. A power of sale attaches in such circumstances by implication of law."

In *Toronto Gen. Trusts Co.* v. *C., B. & Q. R. R. Co.* (*supra*) the will created a trust with income payable to the testator's widow. The express power to sell the stock conferred upon the trustee could not be exercised during the life of the widow, but came into existence only at the death of the widow. In spite of the limitations contained in the will, the trustee sold the securities. They were extremely speculative in character and subject to wide fluctuations in value. The Court of Appeals sustained the sale by the trustee of the securities in the lifetime of the widow, principally upon the theory of implied power. It thereby justified the prudence of the trustee in thus protecting the beneficiaries. The opinion of the First Department of the General Term, which was adopted by the Court of Appeals, states: " On the other hand, the doctrine contended for by the plaintiff's counsel would, in many

cases, lead to the result that when, as frequently happens, the instrument creating the trust contains no power of sale, the trustee has no duty to watch the securities in his charge, to see whether they are appreciating or depreciating in value; and even if he sees that they are depreciating in value and may eventually become worthless, *he is wholly powerless, and must stand idly by until the trust fund has entirely disappeared.* A doctrine, which leads to this result, *cannot be a sound one.* * * * While we concede that the general rule is, as claimed by plaintiff's counsel, viz., ' that trustees may not sell or vary specific securities given in trust, nor securities left by a testator, in which he has himself invested the funds,' we think that this rule does not prevent trustees from converting wasting securities into those of a permanent character, and converting investments, that are not authorized by law, into such as are allowed by law." The Court of Appeals in *Mertz* v. *Guaranty Trust Co.* (247 N. Y. 137) followed the rule just stated. There the creator of the trust had conveyed to the trustee 100 shares of the stock of the Shuttleworth Brothers Company. No power of sale was conferred upon the trustee. These shares were specifically converted by corporate action into 800 shares of the Mohawk Carpet Company. The question there, as here, was one of power. Despite the absence of a power of sale, the trustee was held to have the implied power and authority to vary the investment and dispose of the converted security. Chief Judge Cardozo observed in his opinion: " Enough for present purposes that there is power, if not duty."

The same rule applies to emergencies in trusts not only where there is an absence of a power of sale in a will, but also where there is a prohibition against sale. It has been satisfactorily established by the evidence before me that the continuance of the publication of the newspapers, which are the principal assets of the Press Publishing Company, will in all probability lead to a serious impairment or the destruction of a large part of the trust estate. The dominant purpose of Mr. Pulitzer must have been the maintenance of a fair income for his children and the ultimate reception of the unimpaired corpus by the remaindermen. Permanence of the trust and ultimate enjoyment by his grandchildren were intended. A man of his sagacity and business ability could not have intended that from mere vanity, the publication of the newspapers, with which his name and efforts had been associated, should be persisted in until the entire trust asset was destroyed or wrecked by bankruptcy or dissolution. His expectation was that his New York newspapers would flourish. Despite his optimism, he must have contemplated that they might become entirely unprofitable and

their disposal would be required to avert a complete loss of the trust asset. The power of a court of equity, with its jurisdiction over trusts, to save the beneficiaries in such a situation has been repeatedly sustained in New York and other jurisdictions. In our own State these rules have been applied in addition to the *Mertz* and *Toronto Gen. Trusts Cases* (*supra*), by other decisions (*Matter of Quinby*, WINGATE, S., 134 Misc. 296; *Matter of Pressprich*, 124 id. 15; *Costello* v. *Costello*, 209 N. Y. 252; *Guaranty Trust Co.* v. *U. S. Steel Corporation*, 107 Misc. 720; affd., 187 App. Div. 889; affd., 226 N. Y. 693).

In *Matter of Pressprich* (124 Misc. 15) the will forbade the sale of the specified securities except only when "non-income producing." I held that the trustees were not required to await that event, but might sell under their implied power since it was a matter of common experience that securities greatly depreciate in value in advance of an actual suspension of dividends or cessation of payment of interest on bonds. Other examples of the rule that the courts will be guided by the policy of protection of the trust funds rather than blind obedience by the trustee to the language used by the testator may be found in *Matter of O'Donnell* (221 N. Y. 197); *Bigelow* v. *Tilden* (52 App. Div. 390); *Matter of Varet* (181 id. 446; affd., 224 N. Y. 573); *Matter of Wotton* (59 App. Div. 584; affd., 167 N. Y. 629).

Courts of equity in other jurisdictions have found power to relieve against the provisions of the instrument by granting the authority to dispose of perishable property or wasting assets, despite the express command or wishes contained in the will. Thus in *Weld* v. *Weld* (23 R. I. 311) the prohibition of the will was against the sale of securities unless par was obtained for them, and the estate was required to be kept together until the death of every individual who was named as an annuitant. Authority to sell was found to exist. In *Stout* v. *Stout* (192 Ky. 504) the principal asset of the estate consisted of a business which the trustees were directed to continue. The court authorized the trustees to sell the business which had become unprofitable by reason of the advent of National prohibition. In *Johns* v. *Montgomery* (265 Ill. 21), where the trust deed required the retention of the land and its operation for agricultural purposes, the court recognized its duty and that of the trustee to protect the estate. The opinion recites: " ' Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of the court of chancery must be invoked to grant relief imperatively required, and in such cases the court must, as far as may be, occupy the

place of the party creating the trust and do with the fund what he would have dictated had he anticipated the emergency' * * * (From *Curtis* v. *Brown,* 29 Ill. 201.) The facts here present the alternative of modifying the trust agreement or else losing the entire trust estate. * * * In our opinion the facts present a case calling for the interposition of a court of equity in order to preserve a trust estate which would otherwise ultimately be lost to its owners." (See, also, *Packard* v. *Ill. T. & S. Bank,* 261 Ill. 450; *Curtiss* v. *Brown,* 29 id. 201; *Denegre* v. *Walker,* 214 id. 113; *Matter of Mercer Home,* 162 Penn. St. 232; *N. J. Nat. Bank & Trust Co.* v. *Lincoln Mortg. & Trust Co.,* 148 Atl. 713.)

In New York State the power of a court of equity over the *personal* property of an infant has always been recognized. (*Losey* v. *Stanley,* 147 N. Y. 560; 569.) A different rule, derived, without doubt, from the feudal respect for the heir, applied to the real estate of the infant. But even as to realty, the procedure for authorizing the disposition of unproductive property for the preservation of the trust or the protection of infant beneficiaries in the absence of a power of sale or in contravention of the terms of the trust, has been supplied by statutory authority. (Real Prop. Law, § 105, as amd. by Laws of 1930, chap. 808; Id. § 107, as amd. by Laws of 1920, chap. 639; Surr. Ct. Act, § 250-a.)

The extreme circumstances in the pending case surely justify the alternative of disregarding the directions of the testator, if mandatory, and reading into the will a power of sale. Briefly summarized, the proofs submitted to me show that the losses in the business operations of the three newspapers owned by the Press Publishing Company for the five years from 1926 to 1930 averaged $811,822.10 per year. In 1929 the loss was $1,062,749.80. In 1930 the loss was $1,975,604.77. In 1930 the loss grew, despite economies effected that year, aggregating $1,250,000. The advertising lineage of the three newspapers has greatly declined in recent years. The total circulation of the three newspapers has likewise declined in the last three years. The reserves of the corporation have diminished to the extent of $3,025,000 in the past five years. The present reserves, it is stated, would not permit continued publication of the newspapers for more than three months. The testimony showed that the decline in revenue was not due to the business depression caused by the panic of 1929, but antedated it by at least two years. The trustees have attempted to correct the deterioration which has occurred by employing specialists and experts in the advertising and circulation fields. The loss for the year 1931, it is estimated, will be $2,500,000. The Press Publishing Company has certain other income (aside from newspaper operation) from

syndicate participation and investment activities. Despite the profits and income derived from these sources, the loss of the Press Publishing Company from all its operations has averaged, during the past five years, $427,000 per year. The loss for 1930 was $1,677,625.80.

It is interesting to note that a somewhat similar situation existed in the sale of the New York *Times* in 1893. George Jones was one of the largest stock owners in the enterprise — The New York Times Association. He left the stock in trust, His will provided: " Whereas I am the owner of forty-six shares of the capital stock of the association ' The New York Times,' I direct that my executors shall not sell, or otherwise dispose of the same, or any of them, during the said trust. I give to my executors full power to sell any and all other property, real or personal, constituting the said trust estate, and direct them to invest the proceeds as they shall consider safe and proper." There as here the newspaper was conducted by the trustees. The newspaper became financially unproductive. An equity receivership resulted. Involved in the action there came in question the sale of the assets of the association and the right of the executors of George Jones to sell the stock in contravention of the terms of the trust. Despite the command of the testator, the executors were authorized by the court of equity to liquidate the shares held by the estate. The decree approving that direction and authorizing the sale of the New York *Times* was made by Justice, afterwards Presiding Justice, MORGAN J. O'BRIEN, upon August 8, 1893, and the newspaper was sold pursuant to its direction.

The trustees here find themselves in a crisis where there is no self-help available to them. A judicial declaration is necessary, not only as to their general authority, but as to the effect of the words of Mr. Pulitzer contained in his will. The widest equity powers exist in the Surrogate's Court of this State by the grant of legislative authority contained in section 40 of the Surrogate's Court Act. (*Matter of Raymond* v. *Davis*, 248 N. Y. 67, 71.)

I accordingly hold, in this phase of the decision, that the terms of the will and codicils do not prohibit the trustees from disposing of any assets of the Press Publishing Company; that the trustees have general power and authority to act in the conveyance of the assets proposed to be sold, and that this court, in the exercise of its equitable jurisdiction, should authorize them by an appropriate direction in the decree to exercise such general authority.

(2) The secondary relief sought in this application is the approval by the surrogate of the proposed contracts for the sale of the New York *World*, the *Sunday World* and the *Evening World* and other

intangibles by the Press Publishing Company. When analyzed and stripped of the extraneous issues, the question here is a simple one. A contract has been made by a corporation, the Press Publishing Company, for the sale of certain of its assets to another corporation, The Consolidated Newspaper Corporation. The trustees of this estate are not parties to that contract in their fiduciary capacity as such trustees. Their signatures in that capacity do not appear on the contract. The estate does not own all the stock of the Press Publishing Company. There are six directors including the trustees. Three of the directors have no personal interest in this estate. I am asked as surrogate to approve a private contract between these two corporations. In other words, the corporate activities of all the officers and directors and stockholders of the Press Publishing Company are attempted to be directly brought within the jurisdiction of the Surrogate's Court, and their actions sought to be approved. Upon and since the argument of the questions involved in this proceeding, other offers have been made for the purchase of the corporation assets involved in the contracts between the two corporations. One of these offers comes from a group of veteran employees of the newspapers. In view of my conclusion that I have no power to entertain any offer, the details of such bids should be submitted to the Press Publishing Company.

In this general situation, consideration must be given primarily to the jurisdiction of this court to act. The Surrogate's Court has no legal power to set itself up as a regulatory body over corporate action. It is not authorized to determine disputes between stockholders of a corporation, where any of such stockholders may hold their shares by individual title and ownership. It has no right to pass on conflicting offers of purchase of corporate assets. With the exceptions which I have made later in this decision, the fact that an estate may own part of the stock affords not even a pretense of power in the court over corporate conduct. Nor can any unwarranted use of judicial power justify the conversion of the court into an auction room for bidders for property owned by such a corporation. The argument for such power in the court not only ignores the law, but becomes ridiculous when the rights of other stockholders, holding by individual ownership, are considered. Their interest in the corporation cannot be jeopardized by any such extra-judicial acts.

The basic jurisdiction of this court is to administer justice in matters relating to the estates of decedents. The limitations upon that jurisdiction are found in the statutes, and particularly in the Surrogate's Court Act, and the decisions construing such laws.

I am unable to find any decision which authorizes the surrogate to interfere in a case like the pending proceeding, either as a matter of statutory authority, or within the equitable powers vested in this court. Exceptional cases may arise where the executor or trustee may be committing waste of the assets by virtue of the voting power given to him over the estate stock. But control or prevention in such cases may be exercised not over the corporation but only by direct action of the court against the fiduciary. That distinction is clear. Ample control over corporations in appropriate cases has been given to the Supreme Court.

In this question of our jurisdiction, it matters not whether the interest of the estate in the corporation be large or small, whether the percentage of ownership of the stock be ninety per cent or ten per cent. In no event is the Surrogate's Court permitted to intervene in its internal affairs. A different situation might arise and different responsibilities accrue where the entire stock of the corporation was owned by the estate. In cases of that character, the court, in its equitable powers, might disregard the corporate entity.

The pernicious effects of a policy of intermeddling must be obvious. If the surrogate may reach in by order or decree to authorize the specific sale of the assets of a corporation, irreparable damage might be done to the rights of other stockholders, and particularly minority stockholders. The rights of creditors may likewise be prejudiced. Neither of these groups of interested persons can be brought in as parties before the surrogate, and his decree, in its legal effect upon them, would be futile and void. Further effects of that pernicious policy can be plainly visualized. Administrators, executors and trustees could importune this court for authority to determine internal corporate action, the disposal of corporate assets, the increase of capital stock, questions of mergers and all the other innumerable forms of corporate activities. These questions would be thrust upon a court in the midst of its other and proper business, and appeals made to a judicial officer, who could not and should not be asked to become acquainted with the intimate business details of the problem, or the wisdom or desirability of the action sought to be approved.

Inevitably, the motives of many of the fiduciaries would be to secure a form of judicial sanction of transactions for the purpose of influencing the opinions or conduct of other stockholders. A method would thereby develop by which the responsibility of the officers and directors of a corporation could be evaded by them and the burden cast upon the surrogate. Such a proposal is contrary to common sense, logic and the law itself. We are dealing here, *not with the assets owned by the estate.* We are asked to go a long

step further and to deal with the *assets of a corporation, part of the stock of which is owned by the estate.* The provisions of section 215 of the Surrogate's Court Act apply to the sale of personal property only where it is directly owned by the estate. It has no application to a case where a corporate entity intervenes. The powers of the surrogate under section 215 of the Surrogate's Court Act to advise the representative, or to instruct him as to the sale of securities owned by the estate, has been sparingly exercised by the Surrogates' Courts and only in exceptional cases. That policy has been founded upon the responsibility of the executor or trustee selected by the decedent himself to discharge the duty placed upon him by law or the terms of the will. My distinguished predecessor, Mr. Surrogate FOWLER, clearly enunciated this rule of guidance in *Matter of Schleif* (169 N. Y. Supp. 814). (See, also, *Matter of Quinby*, WINGATE, S., 134 Misc. 296, 303; *Matter of Goldfarb*, 93 id. 401; *Matter of Ximenez*, 107 id. 460.)

In the treatment of the relation of the executor or trustee to the internal corporate management, distinction should be drawn between the situation here, where judicial approval of a specific corporate contract is sought, and, on the other hand, the responsibility to the estate of the fiduciary for bad faith, fraud or embezzlement as an officer or director of the corporation. In the latter case the law finds a method of surcharging the representative for his faithless conduct. For the violation of the trust in the misappropriation of the assets of the corporation, the representative or his surety has been held liable. (*Matter of Auditore*, 249 N. Y. 335.)

The mere fact that the estate may own some of the stock does not justify a trespass into a field beyond our jurisdiction. General authority in the trustees has been found by me. Specific authority to make the particular contract or to approve its terms is lacking. The surrogate cannot examine, therefore, into the advisability of the terms of the proposed sale or give any judicial recognition to the consummation of the specific contracts of the corporation submitted here.

My determination that I have no jurisdiction to approve the particular corporate contracts, or their specific terms, or the manner of the sale, is not to be construed to indicate either approval or disapproval of the specific terms of the transaction. The responsibility of consummation rests squarely upon the officers and directors of the Press Publishing Company. They have the duty to weigh the advantages of the proposed sale or any other offers submitted to them. A separate responsibility rests upon them because of their separate status as trustees of this estate. They hold dual trust positions. Their duties as trustees of the estate

and the measure of the loyalty to the beneficiaries, and particularly the infants, have been repeatedly stated in the authorities. (*Costello* v. *Costello*, 209 N. Y. 252.)

The three directors, in their separate capacity as trustees of this estate, are required to exercise their discretion, diligence, judgment and prudence under the rules laid down for observance by trustees. They are " bound in the management of the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general, prudent men of discretion and intelligence in like matters employ in their own affairs." (*Costello* v. *Costello, supra.*)

The trustees should act in the exercise of the power and general authority found to be vested in them by the surrogate, in accordance with the legal obligations and standards of duty required of them as such trustees.

Submit decree on notice settling the account, construing the will and containing appropriate provisions in accordance with the foregoing conclusions. The decree may contain a provision reserving for determination by supplemental decree the question of the construction of subdivision 6 of article 6 of the codicil of March 23, 1909, or any subsequent modification thereof. The disposition of that question is not directly involved in the issues determined by this decision.