[Civil No. 3393.  Filed December 18, 1934.]

[39 Pac. (2d) 629.]

ALFRED DOWNING BELL and MADELINE BELL SHARP, Formerly MADELINE BELL, (Defendants), Appellants, v. MARY M. BELL, Individually and as Testamentary Trustee, and MARY PATRICIA SCULLY (Plaintiffs), LUCINDA TEMPLETON, HANNAH NEWMAN, SUSAN H. GROTHE, A. L. HAWLEY, W. E. DUDLEY, J. J. HILL, W. H. HILL, LAURA H. BARNHILL, P. P. SHAI and MORTGAGE INVESTMENT COMPANY, a Corporation (Interveners), Appellees.

Messrs. Cunningham, Carson & Gibbons, for Appellants.

Messrs. Ellinwood & Ross, Mr. Wm. H. MacKay, Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld and Mr. John L. Gust, for Interveners-Appellees.

LOCKWOOD, J.—William Mitchell Bell died in the county of Maricopa about the year 1914, leaving an estate consisting principally of real property, and as heirs his wife, Mary M. Bell, and three children, Mary Patricia, Madeline and Alfred Downing Bell, all at that time being minors. By the terms of his will, after certain small bequests had been paid, he left all of his interest in the community property to his wife in trust for his three children equally, their shares to be delivered to them, or their survivors, when they reached the age of 21. The wife, of course, was the absolute owner of an undivided one-half interest in the community; the children by the will thus taking a one-sixth interest each. The will was duly probated and the property distributed according to its terms in 1918. The principal asset was certain real estate situate on the corner of Central Avenue and Roosevelt Street in Phoenix, Arizona. At the death of the testator it was unencumbered, but by order of the court it had from time to time been mortgaged, until in 1928 the encumbrance was about $11,000. The carrying cost of the Central Avenue lots, including interest and taxes, in the year 1928, almost equaled the entire income thereof, because of the fact that the improvements thereon were not at all extensive, although the lots at that time were estimated to be worth about $60,000.

On May 12, 1928, Mary M. Bell, individually and as testamentary trustee, as aforesaid, and her eldest daughter, Mary Patricia Bell Scully, who had by that time become of age, and to whom her undivided one-sixth interest in the property had been transferred, filed a suit in the superior court, with Alfred Downing Bell and Madeline Bell, her minor children, as defendants. The suit was brought to secure an order authorizing her, as testamentary trustee, to borrow

$91,000 and to execute a mortgage on the property on the corner of Roosevelt and Central Avenue, covering the interests of both plaintiffs and defendants therein, for the purpose of paying off all existing debts and encumbrances and placing extensive and permanent improvements thereon. At this time Alfred Downing Bell was a little over 19 and Madeline Bell was approximately 18 years of age. Summons was duly issued, but there is nothing in the record to show whether the same was ever served on defendants or not. However, on the same day the suit was filed, the trial court made a written appointment of Robert McMurchie as guardian *ad litem* for Alfred Downing Bell and Madeline Bell to represent them in the action. Some three days later McMurchie, as such guardian *ad litem,* filed an answer admitting that the defendants were minors, but denying all the other allegations of the complaint, and demanding strict proof thereof, but made no affirmative defense to the action. On the 28th day of May the case came on for hearing; the minute entry of such date showing that the plaintiffs Mary Bell and Mary Patricia Scully appeared in person and by their counsel, W. L. Barnum, and that the defendants Alfred Downing Bell and Madeline Bell appeared in person and by their counsel and guardian *ad litem,* Robert McMurchie. A number of witnesses were examined, and some seven or eight exhibits offered in evidence, and the court thereafter ordered that the prayer of the complaint be granted, and that the trustee be authorized to borrow the sum of $91,000 on the property in question. The money was borrowed, and, so far as it appears from the record, was principally expended in paying the liens already standing against the property and in placing thereon permanent improvements of considerable value. But just about the time that the improvements were completed, the great depres-

sion, which has for so long hung over the country, began. The property was not rented for the amount which had been anticipated, and which at the time of the petition it reasonably appeared it could be rented for, and finally, the interest on the mortgage being greatly delinquent, the mortgagee brought suit to foreclose.

Shortly thereafter, and before the foreclosure suit had gone to judgment, the defendants Alfred Downing Bell and his sister Madeline Bell filed various motions in the original suit in which the permission to mortgage for the $91,000 had been granted, to vacate and set aside the judgment entered therein on the ground that the court was without jurisdiction in the matter. A full hearing was had on the motions, and they were finally by the court denied, and, from the order denying such motions to vacate the judgment, this appeal was taken.

It is contended that the court lacked jurisdiction (a) of the persons of the defendants; (b) of the subject matter of the action; and (c) to render the particular judgment in question. The first question of importance is whether this is a direct or collateral attack upon the judgment. It will be observed that the attack was made in the same proceeding in which the judgment was rendered, that it was made by a motion to vacate the particular judgment attacked, and that its direct and only purpose was to set aside the judgment itself and not to secure, directly at least, any other relief. That this is a direct attack we think there can be no question. *Reinhart* v. *Lugo,* 86 Cal. 395, 24 Pac. 1089, 21 Am. St. Rep. 52; *Symes* v. *Charpiot,* 17 Colo. App. 463, 69 Pac. 311; *Warren* v. *Union Bank,* 157 N. Y. 259, 51 N. E. 1036, 68 Am. St. Rep. 777, 43 L. R. A. 256; *McCampbell* v. *Durst,* 73 Tex. 410, 11 S. W. 380; *Mosby* v. *Gisborn,* 17 Utah 257, 54 Pac. 121.

It is the usual rule that a party who seeks to have a judgment opened must assume the burden of proving the facts essential to entitle him to the relief asked, and, on an inquiry of this kind, if the judgment be rendered in a court of record, every presumption is in favor of the jurisdiction of the court unless it appears affirmatively on the face of the record that it did not have jurisdiction. But, in a direct attack on the judgment for want of jurisdiction, these presumptions are *prima facie* only and may be contradicted by proof. *Turner* v. *Keokuk First Nat. Bank,* 30 Iowa 191; *Francis* v. *Lilly's Ex'x,* 124 Ky. 230, 98 S. W. 996; *Barra* v. *People,* 18 Colo. App. 16, 69 Pac. 1074; *McElroy* v. *Continental Ry. Co.,* 53 Hun 636, 6 N. Y. Supp. 306; *State* v. *Superior Court of Pierce County,* 19 Wash. 128, 52 Pac. 1013, 67 Am. St. Rep. 724. The judgment in question did not show lack of jurisdiction upon the face of the record. We then consider whether defendants have overcome the *prima facie* presumption and shown affirmatively that jurisdiction was lacking.

We consider first the jurisdiction of the person. The record shows the minors appeared by a guardian as, of course, it was necessary that they should. It appears, however, that it was not by a general guardian, but by a guardian *ad litem,* appointed for the purpose of this suit only. What are the requisites for a valid appointment of a guardian *ad litem* in Arizona? The appointment was evidently made under the provisions of paragraphs 413, 414, Revised Statutes of Arizona 1913 (Civ. Code), which read as follows:

"413. Whenever it shall appear to any court in any proceeding or matter being had before such court, that the interests of minors are involved in such proceeding or matter, and that said minors have not appeared therein by a guardian, it shall be the duty

of such court to forthwith appoint in writing some suitable person to act as guardian *ad litem* for such minor or minors, in such proceeding or matter, for the purpose of protecting the interest of such minor or minors in such proceeding or matter.

"414. No person shall be appointed as guardian *ad litem* except upon his written consent, and he shall not be liable personally for costs, unless by special order of the court for some misconduct therein."

And the order appointing, and the consent of the guardian *ad litem* to act appear affirmatively in the record. It is urged, however, by defendants that they were never served with process in the case, and that a guardian *ad litem* may not be appointed for minor parties defendant before such service is made. Let us consider of what the evidence presented to the trial court upon this point consists. Defendant Alfred Downing Bell testified upon the stand at the hearing of the motion to vacate that he had never been served with any process of any kind in the suit, and that neither he nor his sister were present in court at the time the petition to mortgage was heard. Defendant Madeline Bell filed an affidavit that she had never been served with process of any sort during the suit, but the affidavit was silent as to whether she was present in court at the time of the hearing of the petition to mortgage, and she did not testify personally on the motion to vacate. On the other hand, the minutes of the trial court recite affirmatively that both defendants were present at the hearing on May 28, 1928, and Robert McMurchie, the guardian *ad litem*, testified that to his recollection the defendants were present, and the notes of the court reporter taken at the time of the hearing on the petition to mortgage are reasonably susceptible of the interpretation that both of the defendants were present in court at the time. We think it might reasonably be concluded from such evidence that the defendants had

not been served with process, but that they were present in court at the hearing of the petition, and that they made no objection to their being represented by Robert McMurchie as guardian *ad litem*, and we must assume such was the decision of the trial judge.

Was this sufficient to confer jurisdiction of the persons of the defendants upon the court? The nature of the general jurisdiction of a court of equity over the person and property of an infant is fully discussed in *Richards* v. *East Tennessee, V. & G. Ry. Co.*, 106 Ga. 614, 33 S. E. 193, 197, 45 L. R. A. 712. Therein the court said as follows:

"The jurisdiction of courts of equity over the persons and property of infants dates from a very early period in the history of these courts. In its inception, this jurisdiction belonged to the king of England, the same constituting a part of his powers, as *parens patriae*, to protect his subjects, and was transferred by him to the court of chancery. This jurisdiction is broad, comprehensive, and plenary. In all suits or legal proceedings, of whatever nature, in which the personal or property rights of a minor are involved, the protective powers of a court of chancery may be invoked whenever it becomes necessary to fully protect such rights. Should such proceedings be instituted, and it should appear to the court that the infant is unrepresented by any one fully charged with the power and duty of protecting his interests, it is the duty of the court to appoint a guardian *ad litem* for the minor. But the court's duty does not end here. The minor, in such an action, becomes a ward of the court of chancery; and the chancellor himself is, in legal contemplation, the infant's guardian. He continues to look after and protect the rights of the minor, and the appointed representative is but a mere agency through which the court is required to act in giving this protection. To this end the chancellor may compel the guardian to answer the suit, and, whenever it should appear that it is to the interest of the ward to resist the proceeding, he can compel the guardian to take such steps as are neces-

sary to have properly adjudicated the rights of his ward. He can, *sua sponte,* refuse to allow any admissions or concessions made by the guardian against the interest of his ward, and, whenever such guardian is derelict in the performance of his duty, the court can discharge him and appoint another in his stead. In short, this general supervisory power which a court of chancery can exercise over the rights of a minor extends throughout the proceeding, and the plenary jurisdiction of a court of equity in such matters cannot now be questioned. [Citing cases.]

"It follows from the above principles that whenever an application is presented to the chancellor, seeking a sale or other disposition of land in which minors have an interest, either legal or equitable, they become wards of chancery. Such was the nature of the petition in *Sharp* v. *Findley,* 71 Ga. 654. On page 665 of that volume, Chief Justice Jackson, delivering the opinion of the court, says: 'The very minute this petition came before this chancellor, and disclosed the fact that the land of infants was involved, his wards were before him, and the case was concerning "an estate of the wards of chancery."' In the case of *McGowan* v. *Lufburrow,* 82 Ga. 532, 9 S. E. 428 [14 Am. St. Rep. 178], Justice Simmons (now chief justice), after citing approvingly the opinion of Chief Justice Jackson, above quoted, says: 'Here, as we have shown, was an application before the chancellor concerning the estate of infants. According to this decision, just as soon as the application was presented to him they became his wards, or the wards of chancery. He thereby obtained power and jurisdiction over their persons and their property.' In 10 Enc. Pl. & Prac. p. 589, the same principle is announced in the following words: 'Whenever a suit is instituted in the court of chancery relative to the person or property of any infant, although he is not under any general guardian appointed by the court, he is treated as a ward of the court, and as being under its special cognizance and protection.' See, also, authorities cited, including the case of *Sharp* v. *Findley, supra.*"

And in *Hamilton* v. *Tolley*, 209 Ala. 533, 96 So. 584, 586, it is held:

"The chancery court is the general guardian of all infants within its jurisdiction, and, by virtue of its general powers, has ample authority to protect the rights of minors when parties to pending litigations. If the infant was not brought into court by service before the appointment of a guardian was made, the chancellor had the power to make the appointment without service, which duty may and should be exercised whenever the fact of infancy is established, and the infant is within the jurisdiction of the court and in the cause for hearing. *Preston* v. *Dunn*, 25 Ala. 507, 513; *Jackson* v. *Putman*, 180 Ala. 39, 60 So. 61. In *Bondurant* v. *Sibley's Heirs*, 37 Ala. 565, 571, it was held that the appointment of Perkins as the guardian *ad litem*, 'no matter how irregular it may have been, was not void; because the infant was a party to the suit when it was made.' . . . " *Casey* v. *Sacks*, 223 Ala. 147, 134 So. 851; *Peters* v. *Allen*, (Tex. Civ. App.) 296 S. W. 929; *Ferrell* v. *Ferrell*, 53 W. Va. 515, 44 S. E. 187; *Richmond Cedar Works* v. *Stringfellow*, (D. C.) 236 Fed. 264, 265; *New York Life Ins. Co.* v. *Bangs*, 103 U. S. 435, 26 L. Ed. 580; *Manson* v. *Duncanson*, 166 U. S. 533, 17 Sup. Ct. 647, 41 L. Ed. 1105.

There are some states, however, which hold a judgment based on the appointment of a guardian *ad litem* before the infants have been served with summons is void. Among the cases in such jurisdictions so holding are *Johnston* v. *San Francisco Sav. Union*, 63 Cal. 554; *Good* v. *Norley*, 28 Iowa 188; *Tanner* v. *Schultz*, 97 Okl. 132, 223 Pac. 174; *Dougherty* v. *Fouche*, 149 Ga. 608, 101 S. E. 578; *Martin* v. *Battey*, 87 Kan. 582, 125 Pac. 88, Ann. Cas. 1914A 440; *Lanhan* v. *Bomar*, 123 S. C. 483, 124 S. E. 635; *Holloway* v. *Brown*, 181 Ky. 716, 205 S. W. 925. It appears, however in each of these jurisdictions that the decision was based upon a special statute. In California,

the Code of Civil Procedure of 1872, then in force, provided:

"373. When a guardian is appointed by the court, he must be appointed as follows: . . .

"2. When the infant is defendant, upon the application of the infant, if he be of the age of fourteen years, and apply within ten days after the service of the summons; if he be under the age of fourteen, or neglect so to apply, then upon the application of any other party to the action, or of a relative or friend of the infant."

And it was held in *Spear* v. *Ward,* 20 Cal. 659, that this section applied to the appointment of a guardian *ad litem,* and that, since the statute provided the application for appointment must be made after the service of summons, the court was without jurisdiction to make it until after such service. Section 411 of the same Code expressly provided for service of summons on a minor defendant, and the manner in which it must be made. In Iowa the statute expressly stated the appointment could not be made until after service of summons on the minors, and such was the case in Oklahoma, Georgia, Kansas, South Carolina, and Kentucky.

We have been cited to no decisions holding directly and positively that under the original chancery practice and in the absence of any special statute or rule of court the appointment of a guardian *ad litem* for an infant who had not been served by process was void and did not give the court jurisdiction of the person of the minor, although it is frequently held that such an appointment is an irregularity or error which may be attacked on appeal. *Walker* v. *Hallett,* 1 Ala. 379; *Bostleman* v. *Henkle,* 152 Ark. 628, 239 S. W. 30; *Bunting* v. *Bunting,* 87 N. J. Eq. 20, 99 Atl. 840; *Dudley* v. *Tyson,* 167 N. C. 67, 82 S. E. 1025; *Terrell* v. *Weymouth,* 32 Fla. 255, 13 So. 429, 37 Am.

St. Rep. 95. The Indiana cases come nearer than any others to the conclusion that such appointment is void. *Roy* v. *Rowe,* 90 Ind. 54. But even there it is held the actual appearance of the infants in court waives the necessity for service of summons before the appointment. *Robbins* v. *Robbins,* 2 Ind. 74. We hold, therefore, that under its original chancery powers, and in the absence of a limiting statute, a court of equity may make the appointment of a guardian *ad litem* for a resident minor defendant in cases affecting the realty of the minor situated within the territorial jurisdiction of the court, without the necessity of service of summons upon such defendant, and that such appointment is at the most merely erroneous and not void, unless it appears from the record there was actual or constructive fraud prejudicial to the interests of the minors as the result of such appointment.

Let us next determine whether there was at the time the judgment involved was rendered any statute in Arizona which took away or limited this general chancery power of the court, as do the statutes of those states which hold that the appointment of a guardian *ad litem* is void if made without service of summons, and that all subsequent proceedings are *coram non judice.* In the Code of 1877, section 2446 appeared, which read in part as follows:

"2446. The guardian shall be appointed as follows: . . .
"2d. When the infant is defendant, upon the application of the infant, if he be of the age of fourteen years, and apply within ten days after the service of summons; if he be under the age of fourteen, or neglect so to apply, then upon the application of any other party to the action, or of a relative or friend of the infant."

It is, as will be noted, substantially like section 373, Code of Civil Procedure of California 1872,

above quoted, under which section the courts of California have held the appointment of a guardian *ad litem* before service of summons to be a nullity. Had such statute been in force in 1928, it might well be urged, as it was held in California, that the chancery powers of the court were limited thereby. But in 1887 this section was repealed and replaced by section 691 of that Code, which was taken bodily from the state of Texas. This section reads as follows:

"691. In all cases where a minor may be a defendant to a suit and it shall be shown to the court that such minor has no guardian within the territory, it shall be the duty of the court to appoint a guardian *ad litem* for such minor, for the purpose of defending such suit, and to allow him a reasonable compensation for his services to be taxed as part of the costs of the suit."

And under the decisions of Texas thereon, a failure to serve the infant before the appointment of a guardian was at most only reversible error and did not amount to a lack of jurisdiction of the person. *McAnear* v. *Epperson,* 54 Tex. 220, 38 Am. Rep. 625; *Alston* v. *Emmerson,* 83 Tex. 231, 18 S. W. 566, 29 Am. St. Rep. 639; *De Proy* v. *Progakis,* (Tex. Civ. App.) 259 S. W. 620. Section 691 was carried forward in substance in the Civil Code of 1901 as paragraph 1312 thereof, and appears in the Civil Code of 1913 as paragraph 415 thereof. In addition paragraphs 1310 and 1311 of the Civil Code of 1901 were added, which contain in effect the provisions of paragraphs 412, 413 and 414, Revised Statutes of 1913 (Civ. Code). It is true that under paragraph 415, Revised Statutes of Arizona 1913 (Civ. Code), *supra,* before the appointment of a guardian *ad litem,* it must first appear that the minor has no guardian within the state. But where the appointment is made under paragraph 413, *supra,* there is no

requirement of any showing except that the interests of the minors need protection and that they have not appeared by a guardian, and there is no other limitation as to the power of the court to make the appointment. Nor was it necessary that the infants consent formally to the appointment of the guardian *ad litem*, even though they were over the age of 14 years. It is true that paragraph 1107, Revised Statutes of Arizona 1913 (Civ. Code), reads as follows:

"1107. If the minor is under the age of fourteen years, the court may nominate and appoint his guardian. If he is above the age of fourteen years he may nominate his own guardian, who, if approved by the court, must be appointed accordingly."

But this paragraph is found in chapter 15 of part 4 of title 6 of the Civil Code, which refers to guardian and ward, and paragraph 1131 of that chapter reads as follows:

"1131. Nothing contained in this chapter affects or impairs the power of any court to appoint a guardian to defend the interests of any minor interested in any suit or matter pending therein."

We have had in this jurisdiction three cases where infants commenced actions without the appointment of a guardian *ad litem* in the manner provided by paragraph 412, Revised Statutes of Arizona 1913 (Civ. Code), which reads as follows:

"412. If any minor shall desire to bring a civil action in any court of this state, the court in which such action is proposed to be brought may, upon the petition of any relative or friend of such minor, or of such minor if over the age of fourteen years, appoint a guardian *ad litem* for such minor for the purpose of bringing such action; and such action may thereupon be brought in the name of such minor by his guardian *ad litem*. Before the guardian *ad litem* shall receive any money or property of such minor he shall file a bond as security therefor in such form,

and with such surety, as the court may prescribe and· approve."

Such section clearly contemplates that the guardian is to be appointed upon the petition of the minor if over the age of 14 or that of a relative or friend if the minor is under that age, and the appointment is to be made before the suit is brought, but in each of those cases it was held that the failure of the infant to have a legally appointed guardian *ad litem* before the filing of the complaint was a mere irregularity which did not even warrant a reversal upon appeal, and that it might be cured by an appointment *nunc pro tunc,* and that the failure to appoint would not affect the jurisdiction of the court. *Arizona Eastern Ry. Co.* v. *Carillo,* 17 Ariz. 115, 149 Pac. 313; *Lorden* v. *Stapp,* 21 Ariz. 646, 192 Pac. 246; *In re Estate of Harris,* 38 Ariz. 1, 296 Pac. 267. It is true that these cases applied only to the appointment of a guardian *ad litem* for a party plaintiff, but the theory of the cases obviously was that, since the infant was actually properly represented in the proceedings, his substantial interests were not affected by a failure to comply with the statute before the suit was commenced. Applying the same reasoning to the appointment of a guardian *ad litem* for a party defendant, if from the whole record it appears that the infant has been properly represented by a guardian *ad litem,* we are of the opinion that the failure to serve summons upon the infant is, as was held in the three Arizona cases just cited, a mere irregularity which certainly does not go to the jurisdiction of the court. Since therefore the evidence shows that, although the minors were never formally served with summons, they actually appeared before the court at the hearing of the petition to mortgage and were represented throughout by a guardian *ad litem,* the court had jurisdiction of the persons of the minors,

and the judgment cannot now be questioned except for fraud. As to whether or not the guardian *ad litem* was guilty of fraud we shall consider later.

We come next to the jurisdiction of the subject matter. As the record shows, the title to the property was held by a testamentary trustee after a distribution of the property in probate proceedings. It is urged by defendants that jurisdiction of the trust remained in the probate court. We think this position is untenable. Paragraph 1055, Revised Statutes of Arizona 1913 (Civ. Code), upon which defendants base this contention, mentions only the settlement of the accounts of a trust as remaining within the jurisdiction of the probate court. While we have never been called upon to construe the effect of this statute, it obviously was copied from the Code of Civil Procedure of California, and the courts of that state have held, in construing the section from which ours was taken, that the general administration of testamentary trusts, after distribution, is in the superior court. *In re Hubbell's Estate,* 216 Cal. 574, 8 Pac. (2d) 530; *Johnson* v. *Superior Court,* 77 Cal. App. 599, 247 Pac. 249; *Morffew* v. *San Francisco & S. R. R. Co.,* 107 Cal. 587, 40 Pac. 810. The probate court therefore had no jurisdiction of the testamentary trust except for the purpose of settling the accounts of the trustee.

But it is contended that, because a general guardian had been appointed by the probate court for the defendant minors before the appointment of the guardian *ad litem,* that court, having jurisdiction of the relationship of guardians and wards and the estates of the latter, alone could order the property or trust to be mortgaged. We are of the opinion this position is also unsound. The statutes in regard to guardian and ward do give the probate court jurisdiction to mortgage the ward's estate under certain cir-

cumstances, but give it no power over the estate of testamentary trustees. The very purpose of creating a trust by will is that the trustee and not the *cestui que trust* will hold the legal estate; the right of the *cestui que trust* being purely an equitable one. And it is the estate of the trustee which is mortgaged. Since the probate court has no jurisdiction over the estate of any trustee, except as provided by paragraph 1055, *supra,* it is, of course, vested in the superior court. Section 6, art. 6, Constitution of Arizona.

The test of jurisdiction over the subject matter of an action is not whether the conclusions of the court in the course of its exercise are right or wrong, but whether it has the power to enter upon any inquiry in the premises. *Tube City Mining & Milling Co.* v. *Otterson et al.,* 16 Ariz. 305, 146 Pac. 203, L. R. A. 1916E 303; *Brecht* v. *Hammond,* 35 Ariz. 383, 278 Pac. 381. That the superior court having, as we have shown, general authority over testamentary trusts, has the power to enter upon the inquiry as to whether the estate of the trustee under the will could and should be mortgaged, cannot be questioned. Jurisdiction to hear a petition for the construction of a trustee's power is inherent in any court of equity, in the absence of a statute removing it. Such jurisdiction has been entertained practically since the origin of courts of chancery, and does not rest upon a statute, but upon established equity practice. As is said in Pomeroy's Equity Jurisprudence, fourth edition, section 1064:

" . . . The trustee is always entitled to maintain a suit in equity and obtain a judicial construction of the instrument, and directions as to his own conduct."

The jurisdiction does not exist only because there is a will establishing a trust involved, but because courts of equity have always had jurisdiction to con-

strue all kinds of trusts and instruct trustees thereunder.

The last jurisdictional question is whether the trial court had jurisdiction to render the particular judgment which it did. This means that the court can only render a judgment such as does not transcend the extent or character of judgments which are applicable to the class of cases under consideration. *Ex parte Nielsen,* 131 U. S. 176, 9 Sup. Ct. 672, 33 L. Ed. 118; *Windsor* v. *McVeigh,* 93 U. S. 274, 23 L. Ed. 914; *In re McNeil,* 68 Kan. 366, 74 Pac. 1110, 1 Ann. Cas. 733; *Davidson* v. *Wampler,* 29 Mont. 61, 74 Pac. 82. To illustrate, the superior court has jurisdiction of the subject matter both of divorce cases and homicides, but in a divorce case it has no jurisdiction to render a judgment of death against one of the parties nor in the murder case can it divorce the defendant from his wife. But it has jurisdiction to grant the decree of divorce to the party who, under the law and the evidence, is not entitled to it, or to sentence a defendant to death, when under the law as applied to the facts he should be acquitted. In such case the remedy is by appeal, and not by an attack on the judgment for want of jurisdiction to render it. It is not a question as to whether the judgment rendered correctly construed the law, as applied to the facts before the court. A mistake in this respect would be merely erroneous. That the judgment rendered in this case was, in the true sense, one which the court had the power to render is obvious, no matter how mistaken it may have been in the construction which it placed on the trust instrument and the law and facts on which it based its decision.

The decisions cited by the defendants in regard to the lack of jurisdiction of a court to authorize a mortgage refer entirely to cases where the jurisdiction of

the court in this respect was expressly limited by statute. Probate proceedings are purely statutory, and, if the statute expressly says that property of a ward may be mortgaged only for certain purposes, if application is made to mortgage it for other purposes, the court has no jurisdiction to act, but the right to mortgage in the present case does not rest upon any authority granted or denied by statute, but on the equitable powers of a court of general jurisdiction to interpret the terms and meaning of a trust. We hold, therefore, that on the record the court had jurisdiction (a) of the person of the minor, (b) of the subject matter of the action, and (c) to render the particular judgment which it did, and that it therefore cannot be attacked on a motion to vacate made more than six months after the rendition, unless it appears affirmatively that the guardian *ad litem* was guilty of actual or constructive fraud against the defendants. *Vasquez* v. *Dreyfus,* 34 Ariz. 184, 269 Pac. 80; *Rico Consolidated Min. Co.* v. *Rico Exploration Co.,* 23 Ariz. 389, 204 Pac. 138.

We consider, then, this last question. It is claimed that the authorities are so overwhelmingly to the effect that a trustee of a naked trust, as it is contended this trust was under the terms of the will, cannot mortgage the trust property in order to improve it, that the failure of a guardian *ad litem* to urge such a defense upon the trial court was a dereliction of his duty that amounts to a constructive fraud, although counsel for defendant expressly disclaim any imputation of actual fraud to him. Constructive fraud, as contrasted to actual fraud, may be defined as a breach of legal or equitable duty which, irrespective of the moral guilt or intent of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither

actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud, while they are essential in actual fraud. The presence or absence of such intent constitutes the main difference between actual and constructive fraud. It is, of course, the duty of any guardian to exercise the utmost good faith towards the interests of his wards, and to protect them in every manner in which he reasonably can. It is impossible, however, to lay down a general rule by which we can determine absolutely and under all circumstances just where the line shall be drawn between constructive fraud by a guardian and a mere error of judgment on his part. For the first he is liable; for the second he is not. Generally speaking, we think as fair a test as any is, assuming the interests of the ward to be identical with those of the guardian himself, what would a reasonably prudent man do under the circumstances for the protection of those interests? Indeed, defendants practically assume this to be the correct doctrine, for they base their entire claim of constructive fraud upon the allegation that the guardian *ad litem* failed properly to present the will creating the trust to the court, and to urge upon it that under its terms the trustee was not legally authorized to mortgage the property for the purpose of improving it. The petition to mortgage set up the fact that the interest of the defendants in the property was based on a trust established by the will of their father and the decree of distribution made under such will to their mother, Mary Bell, as trustee, one of the plaintiffs herein. It set forth the fact that distribution had been made in accordance with the terms of the will, and the decree of distribution, which substantially follows the terms of the will so far as the trust is concerned, was offered in evidence before the trial court. The guardian *ad litem* in his answer denied every allegation of

the complaint, except the one that the defendants were minors, and demanded strict proof thereof. The court therefore was fully advised that it was asked to authorize a mortgage under the provisions of a trust created by a certain will, the provisions of which were substantially set forth in the proceedings through the decree of distribution, and which, if the court had desired further information, was easily available to it in its own records. Indeed, the court, when the decree of distribution was offered, stated:

"The court will take judicial notice of any record of the court."

All the facts were therefore before the court, and the only possible criticism of the guardian *ad litem* is that the record does not show that he argued the question of lack of authority to the court. Was this constructive fraud?

The law in regard to the right of the trustees of a trust of this nature to mortgage it to improve the property is not definitely settled. While a majority of the decisions are to the effect that the mortgage may not be made, there are a number of respectable authorities which hold that even when a testamentary trust specifically forbids the mortgage or sale of trust property, when the enforcement of such provision will result in the destruction of the trust estate, a court of equity may disregard it. And such holding is not without reason to support it.

In the case of *Young* v. *Young,* 255 Mich. 173, 237 N. W. 535, 537, 77 A. L. R. 963, the court said:

" . . . Frequently, through an over-abundance of caution, accompanied by a lack of foresight to provide for contingencies, the testator directs that his hand, though stilled by death, shall continue to conduct and control his property. When untoward and unforeseen conditions and exigencies arise, has a court of equity the inherent power to take into con-

sideration, not only what would have been the wishes of the testator, but also what will safeguard the trust fund for the heirs? Under the circumstances presented in this case, may the court decree such changes as common sense and good reason dictate? A long line of cases has established the principle that, when such an unusual exigency arises in regard to the method of handling the property or the *corpus* of the trust fund, it is the right and duty of a court of equity to authorize such changes. [citing cases.] While the very well-reasoned opinion in the *Matter of Pulitzer*, 139 Misc. 575, 249 N. Y. Supp. 87 (1931) is only that of a lower court, the case has prompted a learned article by Professor Austin W. Scott, in the Harvard Law Review, vol. XLIV, 1025, in which the entire subject of deviation from the terms of a trust is thoroughly discussed, and a long list of cases supporting the foregoing principle cited. Attention is called to the case of *Curtiss* v. *Brown*, 29 Ill. 201, an excerpt from which is as follows: 'Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of the court of chancery must be invoked to grant relief imperatively required; and in such cases the court must, as far as may be, occupy the place of the party creating the trust, and do with the fund what he would have dictated had he anticipated the emergency. . . . From very necessity a power must exist somewhere in the community to grant relief in such cases of absolute necessity, and under our system of jurisprudence, that power is vested in the court of chancery.' "

While most of the cases above referred to discuss the sale of property contrary to the terms of the trust, we do not see where the same reasoning will not apply to a mortgage if it reasonably appears that such mortgage will serve the interest of the trust better in the long run than a sale. All of the evidence introduced at the hearing shows beyond question that the property was barely self-sustaining, and that

there was no income and could be no income therefrom sufficient to support the defendants unless improvements were placed thereon which would bring an increased rental. The plans for the proposed improvements were submitted to the court, and a number of disinterested witnesses testified in full detail in regard to the effect of the improvements and their advisability. We think both the guardian *ad litem* and the trial court were justified in believing, under circumstances as they then existed, that it would be to the decided advantage of all the parties, the minor defendants included, that these improvements should be made, nor can we say that, with the decisions as they are on that point, the guardian *ad litem* was in effect guilty of malpractice or breach of trust in not insisting to the court that it had no authority to authorize the mortgage. As a matter of fact, it is apparent to us from the entire record in this case that, when the petition to mortgage was made in 1928, everybody connected with the case, plaintiffs, defendants, attorneys and the court, were of the opinion that it would be highly beneficial to all the parties that the improvements should be made. The entire country was at the time prosperous, and the city of Phoenix particularly was growing rapidly. Had such growth continued for the ensuing ten years as it had for the preceding, we entertain no doubt that the transaction would have proved highly profitable to all concerned. Unfortunately, immediately after the improvements were completed, the worst depression that our country has ever suffered from came on us, and its shadow had not yet been removed. Under such circumstances the property necessarily failed to produce the income which in 1928 could be and was reasonably anticipated. The question really is, Who shall suffer the loss, the owners of the lots or those who in good faith advanced their money upon an

order of the court authorizing the mortgage? Much as we sympathize with the situation in which the defendants find themselves, we are compelled to hold that, under all the facts and the law in the case, the trial court properly refused to vacate its judgment. We have considered the other questions discussed in the briefs, but think it unnecessary to refer to them.

The orders appealed from are affirmed.

ROSS, C. J., and McALISTER, J., concur.