In the Matter of the Estate of WILLIAM DELAVAN BALDWIN, Deceased.*

Surrogate's Court, Westchester County, December 10, 1935.

* See, also, *Matter of Baldwin* (157 Misc. 538).

*Gilbert H. Montague* [*A. A. Clifford Hansen* of counsel], for Thomas M. Logan and The Chase National Bank, as executors.

*Milbank, Tweed, Hope & Webb* [*Timothy N. Pfeiffer* of counsel], for The Chase National Bank, as executor.

*Park A. Doing*, for The Chase National Bank, as trustee named in the will.

*Elijah T. Russell* [*Allen J. Weisman* of counsel], for Delavan Munson Baldwin, individually and as general guardian, etc., objectant.

*Livermore & Livermore* [*Russell B. Livermore* of counsel], for Helen R. Baldwin, widow, and children.

*Szold & Brandwen* [*Maurice Ravage* of counsel], for the National Bondholders Corporation and others.

*Lee Parsons Davis*, special guardian.

SLATER, S. Objection 3 of Delavan Munson Baldwin, a trust beneficiary, individually and as general guardian of Delavan Munson Baldwin, Jr., and Barbara Bull Baldwin and the amended objection of the special guardian for said infants and other infant beneficiaries under decedent's will, relate to the sale of 7,000 shares of the common stock of Otis Elevator Company in 1934, at a price below that received for similar stock in 1931. The charge of negligence is alleged and request is made that the executors be surcharged.

The intermediate account of October 30, 1931, upon which a decree was entered on January 30, 1932, shows that the executors retained about one-half, or 7,000 shares, of all the common stock holdings in the Otis Elevator Company. At such time no question was raised regarding the retention of these shares. If any objection had been made, it was withdrawn. The objectors are barred from charging negligence claimed to have occurred prior to January 30, 1932, the date of the decree. (*Matter of Roche*, 259 N. Y. 458, 461; *Weintraub* v. *Siegel*, 133 App. Div. 677; *Matter of Chaves*, 143 Misc. 868; *Matter of Alexander*, 152 id. 354, 360.)

So we will observe what happened to the Otis Company stock holding after January 30, 1932.

The terms of the will are liberal in granting relief to the executors from liability for retention of stock. (*Matter of Balfe*, 245 App. Div. 22, 25.) The seventeenth paragraph of the will states:

" I authorize and empower my executors to retain all or any stocks, bonds or other securities which I may own at the time of my death, * * *

" I authorize and empower my trustee to accept from my executors any of the stocks, bonds or other securities that I may leave at the time of my death, or in which my executors may have invested any portion of the estate, receiving the same at the fair valuation thereof. * * *

" My executors shall not be responsible for any loss or damage resulting from their retention of any stocks, bonds or other securities owned by me at the time of my death or from any investment made or action taken * * * as hereinbefore in this article provided."

The decedent had held stock of the Otis Elevator Company for many years prior to his death. He was chairman of the board of directors of the company from 1918 to the time of his death, and had been president from 1893 to 1918. At the time of his death the decedent owned a large number of shares of the common stock of the Otis Elevator Company, which, with the shares issued to the executors, represented a total ownership of 13,300 shares which came into the possession of the executors. From October, 1930, to March, 1931, the executors sold 6,300 shares, leaving a balance in their hands of 7,000 shares, all of which were sold from March, 1934, to June, 1934, at *an average price* of $16 per share. On October 6, 1931, the *date* of the intermediate account, the Otis common stock sold at a low of $20.37½. On January 30, 1932, the *date* of the intermediate decree, it sold at a low of $19. Thomas M. Logan, one of the executors, has been secretary and assistant treasurer of the Otis Elevator Company for the past fifteen years. Vincent L. Banker, vice-president of The Chase National Bank, the co-executor, is a trust officer of the bank and this estate has been under his supervision in The Chase National Bank. The evidence shows that, from the date of the intermediate account through to May, 1934, the estate was submitted to the management committee of the bank nineteen separate times, for the consideration of the assets of the estate, particularly the Otis common stock, and at no time during the period until the spring of 1934 was the management committee of the opinion that the stock should be sold. In addition, the statements of the Otis Elevator Company and reports regarding the company's finances were submitted to the management committee six times during this period.

The Otis Elevator Company is the outstanding company in its field, doing approximately sixty per cent of the business of the country. It has paid dividends on its common stock since 1903. During the years in which the executors held the common stock the ratio of current assets to current liabilities was at times as high as sixteen to one. They had a very large surplus running into the millions. The directorate of the company was composed of able men and the management was looked upon as the finest in the elevator business.

In 1933, for the first time since 1899, the company showed an operating loss. The executors took these matters into consideration and especially the past record of the company, its future outlook, and its fine financial position. The executors considered the question of selling or retaining the Otis common stock and, until the spring of 1934, it was their judgment that they should continue to hold. In the spring of 1934 they became concerned whether the company would continue its dividend. After considering confidential figures respecting the company, they thought it best to sell the common stock in view of the need of the beneficiaries of the estate for income. Mr. Albert H. Wiggin was chairman of the governing board of The Chase National Bank until January 1, 1933, and was a director of the Otis Elevator Company, as well as a director of the Westinghouse Company, a competitor. Testimony disclosed that insurance companies and investment trusts retained common stocks of the Otis Elevator Company during the period this stock was retained by the executors.

On January 30, 1932, the date of the intermediate decree, the Otis common stock was quoted at $19.25 low and $19.87½ high. The range for the two years and more between January, 1932, and the date of the sales was from $20 low to $10 low. Stocks which have a spread, I understand, are bought at high and sold at low. That is my experience, at least. The difference between the price at the date of the decree and the date of the sale represents about $20,000.

The objectors say that with the knowledge gained by the executors, as directors of the Otis Company, they should have sold the holdings of the estate sooner than they did. This is just a difference of opinion. The company had a strong financial position and a long prior history of business and earnings and dividends. (*Matter of Winburn*, 140 Misc. 18.)

The suggestion that the stock was held for ulterior motives is without foundation in fact by any evidence produced by the objectors. I find no justification for the suggestion that Mr. Wiggin, the former president of The Chase National Bank, was " trying to get

this stock at bargain prices." The evidence is that Mr. Wiggin and his family owned through a holding company much more of the stock of the Otis Company than did Mr. Baldwin, and held it for a long period of time and did not sell it; that while a director in the Westinghouse Company he owned no stock in that company at any time.

The proof regarding the attitude of the family toward the retention or sale of the Otis stock is important and is that Roland Baldwin, a son, approved of holding this block of Otis stock and in January, 1934, wrote to Mr. Banker: " No doubt the enhancement of the market recently has put us nearer our goal. It is my hope, however, that you continue to hold these securities as it seems that with the present outlook the security market will be much higher a year from now;" that forty letters passed between Mr. Banker and Delavan Baldwin, one of the objectors, none of which asked for a sale of the Otis block of stock; that the beneficiaries, including the objector, Delavan Baldwin, periodically received statements of securities held in the account and were advised of the reduction of the Otis dividend in 1932 and 1933. Mr. Banker testified that, during this entire time, no one made objection to the matter of continued holding of the stock. " In fact, quite the contrary. I had conversations with all of them at various times. In the spring of 1934, when we decided to sell this stock, Mr. George Vanderhoef (a son-in-law of the decedent), who at times represented himself to be the spokesman of the Baldwin family, came to my office and made a very vigorous protest against the sale of the stock."

In view of the decision in favor of the executors on other grounds, it will be unnecessary to decide whether the beneficiaries assented to the retention by the executors. (*Matter of Jarvis*, 110 Misc. 5, 15; *Matter of Chaves*, 143 id. 868, 871; affd., 239 App. Div. 900; *Matter of Packard*, 146 Misc. 65, 68; *Matter of Kent*, Id. 155, 161; *Matter of Turner*, 156 id. 68, 73.)

There was not a scintilla of evidence pointing to negligence, or bad faith, in the conduct of this estate by the executors in connection with the retention or sale of the Otis Elevator stock. There is a broad distinction between negligence and mere error of judgment. The cases are manifold on this point. (*Matter of Winburn*, 140 Misc. 18; *Matter of Clark*, 257 N. Y. 132; *Matter of Pratt*, 143 Misc. 751, 752, 754; *Matter of Sprong*, 144 id. 293, 295; *Matter of Chaves*, 143 id. 868, 871; affd., 239 App. Div. 900; *Matter of Kent*, 146 Misc. 155, 159; *Matter of Beadleston*, Id. 548; *Matter of McCafferty*, 147 id. 179, 204; *Matter of McKee*, Id. 889, 895; *Matter of Farrell*, 152 id. 118; *Matter of Langdon*, 154 id. 252.)

A broad provision for stock retention is found in *Matter of Clark* (257 N. Y. 132); *Matter of Flint* (240 App. Div. 217, 225; affd., 266 N. Y. 607); *Matter of Winburn* (*supra*). Even so, the prudent rule exists. Has the ordinary rule of duty been violated? That is the only real question presented with regard to the stock.

I hold that there was no lack of prudence in view of the economic conditions then prevailing in the country. (*Matter of Clark, supra.*)

It may be termed a misfortune, not a wrong. (*Matter of Garvin,* 256 N. Y. 517.) Upon the facts, and, in addition, because of the provisions in the will authorizing the retention of securities, I find no ground to surcharge. " A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello,* 209 N. Y. 252, 262.) We look at the facts as they exist at the time of their occurrence. (*Matter of Andrews,* 239 App. Div. 32, 36; *Matter of Flint, supra,* pp. 225, 226.) The objections are dismissed.

As to the matter relating to commissions — section 285 of the Surrogate's Court Act reads in part as follows:

" 5. The value of any real or personal property, to be determined in such manner as the surrogate may direct, * * * shall be considered as money in making computation of commissions."

. The manner of determining commissions for receiving the assets of the estate was fixed in the decree of January 30, 1932, *i. e.,* " and in the event of any readjustment of said estimated valuations by the appraisal finally determined in the New York Estate Tax proceeding herein there shall be a corresponding readjustment of said commissions."

The valuations shown in the estate tax schedules as compared to the estimated values shown in the previous accounting show both increases and decreases, and the net result will be considered.

I hold that commissions for receiving are to be based on the values shown in the New York estate tax proceeding. The objection is dismissed.

The executors, heretofore directed by decree dated January 30, 1932, to hold the corpus of the estate *in solido* for the several trusts, are now directed to deliver to The Chase National Bank, as trustee named in the will, the securities for the purpose of setting up the several trusts named in said will, in full amount, or by *proration.*

Paragraph seventeenth of the decedent's will provides that the trustee shall accept from the executors any of the stocks and bonds or other securities which decedent may leave at his death. This by implication carries the right of the trustee to continue to hold such securities. The executors, in the performance of their duty, upon turning over the estate to the trustee, will be relieved from

liability and responsibility. Such property will be held by the trustee pursuant to the terms of the trust. The executors as trustees in the meanwhile will pay to the several trust beneficiaries the income due them, until such time as the executors may transfer the securities to The Chase National Bank as trustee of the several trusts. Said executors are relieved from all liability in the payment of the income to the beneficiaries.

The trust provided for in paragraph eighth of the will has fallen in. The question arises as to how the fund shall be disposed of — as part of the decedent's residuary estate under paragraph fourteenth, or shall it be added to the several trusts which have been decreased by prorating? The lapsed legacy must be used to make up deficiencies in the general legacies. (*Matter of Title G. & T. Co.*, 195 N. Y. 339; *Matter of Avery*, 87 Misc. 75.) In the instant case the gift is to the *residuary estate*, and not to legatees *nominatim*, as was the case in *Matter of Baker* (157 Misc. 904).

Other questions submitted for determination of this court will remain unanswered. Trustees have some responsibility and some duty in the premises.

Proceed accordingly.