In the Matter of the Accounting of HENRY M. HUBBELL et al., as Trustees under the Will of SOPHIE E. HUBBELL, Deceased, Respondents. ESTHER C. WELTMER et al., Appellants; HENRY M. HUBBELL et al., Individually, Respondents.

Argued November 30, 1950; decided March 8, 1951.

*Malcolm Wilson* and *Thomas D. Scoble, Jr.,* for appellants.
I. The Surrogate correctly ruled that respondent trustees had
no power to set aside out of annual income a reserve for real
estate depreciation; he erred in holding that as long as the
annual net income in any event was insufficient to pay respondent
life beneficiary all of the $10,000 per year, he was legally justi-
fied in selling out all of the trust corpus. The Appellate Division
erred in holding that respondent trustees were under a legal
duty to deduct annual reserves for depreciation in the absence
of a specific term in the trust instrument forbidding such a
deduction. Appellant remaindermen are entitled to the relief
herein sought. (*Matter of Ottmann,* 197 Misc. 645; *Matter of
Davies,* 197 Misc. 827; *Matter of Kaplan,* 195 Misc. 132; *Matter
of Kellogg,* N. Y. L. J., Mar. 22, 1950, p. 1020, col. 5; *Matter of
Adler,* 164 Misc. 544; *Matter of Edgar,* 157 Misc. 10.) II. The
corporation owned in equal shares by the trust and respondent
individually, and solely controlled by him, concededly never
preserved a dollar of the " depreciation reserves " deducted
from income on the books. Therefore respondent cannot hide

behind mere bookkeeping falsifications to justify his unnecessary sale of the trust stock to the corporation every year and totally obliterate the corpus of the trust. (*Matter of Richardson,* 149 Misc. 192, 229 App. Div. 738, 255 N. Y. 632; *Underhill* v. *Newburger,* 4 Redf. 499; *Matter of Adler,* 165 Misc. 544; *City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125; *Matter of Ridings,* 297 N. Y. 417; *Munson* v. *Syracuse, G. & C. R. R. Co.,* 103 N. Y. 58; *Matter of Durston,* 297 N. Y. 64; *Carrier* v. *Carrier,* 226 N. Y. 114.) III. Respondent's annual sales of the trust stock between 1936 and 1943 at the fixed value of $370.43 per share, failed in each successive year to make fair allowance for the increased value each year of the additional treasury stock thus created.

*Albert Ritchie* and *J. Addison Young, II,* for respondents. I. Respondents, as trustees, faithfully carried out the provisions of testatrix' will. (*Matter of Flint,* 240 App. Div. 217, 266 N. Y. 607; *Matter of Balfe,* 152 Misc. 739, 245 App. Div. 22; *Frankel* v. *Farmers' Loan & Trust Co.,* 152 App. Div. 58, 209 N. Y. 553; *Matter of Rowland,* 273 N. Y. 100; *Matter of Jackson,* 258 N. Y. 281; *Matter of Clark,* 280 N. Y. 155; *Matter of Woollard,* 295 N. Y. 390.) II. The divided loyalty rule has no application in this case. (*Matter of Balfe,* 245 App. Div. 22; *Crabb* v. *Young,* 92 N. Y. 56; *Matter of Durston,* 297 N. Y. 64; *Matter of Ridings,* 297 N. Y. 417; *Matter of Ryan,* 186 Misc. 688; *City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125.) III. Nothing that the trustee did resulted in any loss or injury to the estate. IV. There was no act of the trustees as directors of the corporation that tended to impair the value of the stock held by them and had there been mismanagement in the affairs of the corporation in which they did not participate they are not liable therefor. (*Isaac* v. *Marcus,* 258 N. Y. 257; *Wilmerding* v. *McKesson,* 103 N. Y. 329; *Bruen* v. *Gillet,* 115 N. Y. 10; *Riggs* v. *Purcell,* 74 N. Y. 370; *Bannon* v. *Bannon,* 270 N. Y. 484; *Skinner* v. *Paramount Pictures, Inc.,* 294 N. Y. 474; *Everett* v. *Everett,* 180 N. Y. 452; *O'Brien* v. *Fitzgerald,* 6 App. Div. 509, 150 N. Y. 572; *People ex rel. Jamaica Water Supply Co.* v. *State Bd. of Tax Comrs.,* 196 N. Y. 39; *Matter of Auditore,* 249 N. Y. 335.) V. The burden of proof was on appellants to establish any loss due to the fault of the trusteees.

FULD, J. Sophie Hubbell died in May of 1931. Her last will, dated in 1928, and a codicil, made less than a year later, were admitted to probate in the Surrogate's Court of Westchester County in June, 1931. She devised and bequeathed the residue of her estate to her husband, Henry Hubbell, and the New Rochelle Trust Company, as trustees, with directions that " should I leave real property or any interest therein, I direct that the same shall be converted into cash and my entire estate * * * converted into cash or investment securities and when so converted I direct that the same shall be invested and reinvested in interest bearing securities and the interest and income thereof paid to my husband * * * for and during the term of his life ". She expressly provided, by the codicil, that, in case such net interest and income should not equal $10,000 in any year, the corpus of the trust was to be invaded upon his request in order to guarantee him that amount. Upon her husband's death, the remainder was to be paid outright or in trust to Janet Hubbell — described as " a member of my family since childhood although not adopted " — to nieces and nephews, or their children, and to several charitable organizations. If she died possessed of stock of the Hubbell-Coligni Corporation or of the Hubbell Hardwood Door Company, such stock, the testatrix recommended, should " be held as a part of the corpus of the various trusts which I have created " and she specified that " such securities * * * be taken at their appraised value on the inventory of my estate for taxation ". Providing that those securities " may be sold at any time with the approval " of her husband " or at any time " that her executors and trustees " may deem advantageous to my estate ", she directed that they " shall not be held accountable for any loss or depreciation in * * * [their] value * * * by the reason of holding them as investments of the trusts ".

Mr. Hubbell and the New Rochelle Trust Company qualified as trustees and have so acted throughout the period involved in this proceeding. Their first intermediate account was judicially settled and allowed in July, 1935. Their second intermediate account, the subject of the present proceeding, covers the period extending from that date to March 12, 1945.

Mrs. Hubbell's entire residuary estate consisted of 618 shares of stock, without par value, of Hubbell-Coligni Corpora-

tion (hereinafter referred to as the Corporation); such shares, representing 50% of the Corporation's outstanding stock, were valued in the federal estate tax proceedings at $228,925.74, being a value of $370.43 a share. The remaining 618 shares of the Corporation were and continue to be owned by the husband, who was and continues to be president of the Corporation and one of its directors. The board consists of three directors, Mr. Hubbell, a nominee of his and a representative of the corporate trustee. The assets of the Corporation consist of three apartment houses, several one-family houses, an industrial parcel, several lots and a farm in Connecticut. Mr. Hubbell and his second wife have been living in one of the one-family dwellings and a hardware company which he controls has occupied the industrial parcel.

No dividend has been paid on the stock of the Corporation since the trust was created; the only income with which the trustees have charged themselves — from sources not altogether clear — is the gross sum of $86.43. The account also shows that, in 1935 and in each of the following eight years, the husband requested that he be paid the guaranteed sum of $10,000. In order to effectuate that result — and procure the $10,000 — the trustees of the estate arranged with the directors of the Corporation, who to all intents and purposes were one and the same, that the Corporation purchase from the trustees in each of the years involved 27 shares of its stock at the inventory value of $370.43 a share. These sales to the Corporation are justified by the trustees upon the ground that they knew of no other market for the stock. As a result of the method of invasion of principal employed, there has been, to the date of the account, a reduction of the estate holdings by approximately 44%, and the trust has been transformed from a holder of 50% of the outstanding stock of the Corporation to an owner of approximately 36% and, by the same token, the husband's holdings have increased from 50% to 64% of the outstanding shares.

In addition to approval of their account, the trustees sought instructions as to how to meet the husband's anticipated demands in later years. In that connection, they showed that in 1944 the Corporation changed its shares of stock from no par to $100 par value, had its assets appraised, and entered the appraised values on its books. This resulted in reducing the

book value of the shares to $152.29 each, and the trustees requested authority to make further sales to the Corporation at that new figure. This would exhaust the remaining shares held by the estate and effect a complete destruction of the trust corpus by the end of 1951.

Appellants, who are some of the remaindermen, interposed various objections to the account. As originally submitted, the account did not reflect the results of the operations of the Corporation; however, following an application for such data, the trustees filed, as a supplement to their account, the financial statements of the Corporation for the years 1935 through 1944. They show that the operations of the Corporation resulted in a loss in each of the ten years, amounting in the aggregate to $26,364.92 (without taking into account a loss of $5,347.27 on disposal of other assets). In arriving at those figures, the Corporation had set up on its books a reserve for depreciation, and that account was credited with the aggregate sum of $104,205.10 during the ten-year period. Accepting those figures, appellants claimed that the income before depreciation — $77,840.18 — should have been distributed and that, if that had been done, less shares of stock would have had to be sold to make up the guaranteed $10,000.

The Surrogate overruled that objection and all of the others advanced. He also approved the proposal of the trustees that, " in order to satisfy the request[ed] invasions of principal for the year 1944 ", they be permitted to sell the stock to the Corporation at the new book value of $152.29 a share. He declined to consider " at this time " the value to be ascribed to the stock and the price at which it was to be sold in the years following 1944. The Appellate Division unanimously affirmed, and the case is here by permission of that court.

It is to be noted at the outset that no basis exists for the claim originally asserted by respondents — though apparently abandoned in this court — that the 1935 decree settling the trustees' account for the period ending July 1935, is *res judicata* as to appellants' present objections. Such a decree is conclusive against the parties only as to matters or items embraced in the account previously approved. (Surrogate's Ct. Act, § 274; see *Joseph* v. *Herzig,* 198 N. Y. 456; *Van Rensselaer* v. *Van Rensselaer,* 113 N. Y. 207; *Matter of Seaman,* 275 App. Div.

484, 487; see, also, Jessup-Redfield, Law and Practice in the Surrogates' Courts, § 457, p. 510; Note, 1 A. L. R. 2d 1060.) The 1935 account failed to name the purchaser of the Corporation's stock from the estate, and, accordingly, the propriety of the sale to the Corporation has not hitherto been reviewed by any court. A most unfortunate circumstance, for had the problem been submitted to the Surrogate when it first presented itself to the trustees, at the inception of difficulties, the present controversy would in all probability have been avoided and there would be no need to assay these transactions in the light of hindsight.

In judging the conduct of trustees, the basic consideration is the fiduciary obligation which they owe to all of the beneficiaries whom they represent. (Cf. *Matter of Durston,* 297 N. Y. 64, 71–72; *Meinhard* v. *Salmon,* 249 N. Y. 458, 464, 468; *Carrier* v. *Carrier,* 226 N. Y. 114, 125–126; *Munson* v. *Syracuse, G. & C. R. R. Co.,* 103 N. Y. 58, 73.) " A trustee ", this court said in *Meinhard* v. *Salmon* (*supra,* 249 N. Y. 458, 464), " is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ' disintegrating erosion ' of particular exceptions (*Wendt* v. *Fischer,* 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Where, as here, the trustees own, in their individual and representative capacities, the entire outstanding stock of a corporation, that duty extends not only to the trust estate as such but also to the operations of the corporation. (See *Matter of Horowitz,* 297 N. Y. 252; *Matter of Doelger,* 279 N. Y. 646, affg. 254 App. Div. 178; *Matter of Auditore,* 249 N. Y. 335, 278 N. Y. 234; *Matter of Witkind,* 167 Misc. 885, 893; *Farmers' Loan & Trust Co.* v. *Pierson,* 130 Misc. 110, 119; see, also, Cahn, Estate Corporations, 86 U. of Pa. L. Rev. 136, 138.) Cahn states the rule in this way (*loc. cit.*): " It is well established that where a trustee holds a working control of the stock in an estate corpora-

tion he is accountable in the probate court for the administration of the corporate affairs. His cestuis que trustent may require him to treat the corporate transactions as though they were his own transactions as trustee [*Farmers' Loan & Trust Co.* v. *Pierson,* 180 Misc. 110; *Matter of Auditore,* 249 N. Y. 335]."

While Mrs. Hubbell necessarily contemplated that the trustees would be required to deal with her husband with respect to occupancy of some of the properties owned by the Corporation — for that condition had existed when the Corporation was formed and was presumably to continue thereafter — there is nothing to indicate that she contemplated that, if it became necessary to sell the stock, the trustees were free to do so by agreement with one of themselves. The law has always frowned upon and condemned sales of trust property by a trustee to himself individually (see, e.g., Restatement, Trusts, § 170, subd. [1], Comment b; § 206, Comment b; 3 Bogert on Trusts and Trustees [1935], § 484), and it can hardly be argued that a sale to a corporation in which one of the trustees was the only other stockholder stands on a different footing from a sale to him individually. Mrs. Hubbell did not direct that the sum of $10,000 a year be paid to her husband under any and all circumstances; it was to be paid to him only if he requested it. When in 1935 he made his request, he undoubtedly realized that he was creating a serious dilemma for himself as trustee and for his cotrustee. With no income available from the stock and, as he testified, with no market for it, it was inevitable that serious damage would be done to the estate unless the greatest care were exercised. For instance, a sale of part of the stock, thereby reducing the estate holding to a minority interest, was bound to render the balance of the holding almost entirely unsaleable and, in any event, to diminish its value seriously. What, then, were the other alternatives available to them; what, the other choices?

The trustees should have considered the possibility of rendering the estate more remunerative. That trustees generally owe a duty to make the assets which they hold for the estate productive is plain. Indeed, the cases are at one in holding that fiduciaries, whether executors or trustees, are under a duty profitably to employ funds in their hands under penalty of personal liability for their neglect. (See *De Peyster*

v. *Clarkson,* 2 Wend. 77, 87–88; *Dunscomb* v. *Executors of Dunscomb,* 1 Johns. Ch. 508, 510–511; *Blauvelt* v. *De Noyelles,* 25 Hun 590, 592–593; *Matter of Ayvazian,* 153 Misc. 467, 477; see, also, Restatement, Trusts, § 181; 1 Perry on Trusts and Trustees [7th ed.], § 452, p. 755.) As a corollary to that general duty — to employ the estate's assets profitably — there arises the further duty to sell or convert unproductive assets and reinvest the proceeds. (See Restatement, Trusts, § 240; see, also, *Matter of Rowland,* 273 N. Y. 100, 108 *et seq.*; *Matter of Pennock,* 285 N. Y. 475, 482–483; *Matter of Pulitzer,* 139 Misc. 575, 579 *et seq.,* affd. 237 App. Div. 808; *Edwards* v. *Edwards,* 183 Mass. 581, 583; *Rhode Island Hosp. Trust Co.* v. *Tucker,* 52 R. I. 277, 278–279; 2 Scott on Trusts, § 240, pp. 1346–1348.) Thus, Scott has written (*op. cit.,* pp. 1346–1347): " Where a trust is created for successive beneficiaries and the trust estate includes unproductive property, the trustee is ordinarily under a duty to sell the property within a reasonable time, and to invest the proceeds in productive property. * * * The principle is also applicable to unproductive property other than land. Thus it has been held that the trustee is under a duty to sell unproductive securities and to invest the proceeds in income-producing property." And that is so, if reason and prudence dictate such action, even where the will authorizes the trustees to retain the stock and exonerates them from liability for loss or depreciation in its value. (Cf. *Matter of Clark,* 257 N. Y. 132; *Matter of Roche,* 245 App. Div. 192; *Matter of United States Trust Co.,* 189 App. Div. 75; *Matter of Baldwin,* 157 Misc. 692, affd. 250 App. Div. 767; *Matter of Pulitzer, supra,* 139 Misc. 575, affd. 237 App. Div. 808; *Matter of Jarvis,* 110 Misc. 5.)

Whether the trustees discharged their obligation in this respect has not heretofore been subjected to scrutiny. It may well be that, in the ordinary case, the presumption should be indulged that the management of a corporation has endeavored to make the best use of its assets. Where, however, the actual results of operation show an unvarying series of losses, more careful inquiry is demanded. Without attempting to pass judgment on the facts, we conclude that such an inquiry is called for here. For example, and we merely mention it as an illustration, the record shows that one of the properties is a farm in Connec-

ticut from which no income has ever been derived although the Corporation has regularly paid taxes upon it.

The trustees should also have given thought to dissolving the Corporation and disposing of individual pieces of property in order to make up the annual deficiency. As noted above, the authorization given to the trustees by the will that they retain the stock constituted no obstacle and, in fact, it was overridden when Hubbell exercised the option given to him in the codicil and demanded $10,000. By exercising that right, he made retention of the stock left by his wife impossible. Even in its own context the direction to retain the stock was not absolute. Under the circumstances which in fact developed, the retention was not warranted if dissolution of the Corporation or a partial liquidation of its assets would have yielded more favorable results for the estate as a whole. That such a conversion from stock ownership to direct ownership might well have benefited the estate in carrying out the annual obligation to raise $10,000 seems sufficiently likely to warrant its consideration upon a new trial.

The law does not, of course, demand prescience of trustees; they are not required to foresee the future of investments in this or that particular enterprise or to predict that those investments will be fruitful, but we are here dealing, not with an enterprise or a corporation whose conduct is incapable of close scrutiny and evaluation, but rather with a company about which the husband — a trustee of the estate, president and director of the Corporation and a 50% stockholder in his own right —not only had intimate familiarity but was its guiding and directing force. By 1935, the opening date of this account, four hopelessly lean years had passed since the testatrix had died, and not a cent of income had been received from the trusteed stock. In spite of that, the trustees were content to stand by as spectators to the gradual obliteration of the trust corpus. At no time, according to the husband, was any thought given to the disposition of the stock, and no effort was made to justify the destruction of the estate through invasion, except by his vague statement that he and his cotrustee were acting in such a manner as to " carry out the intention of the testatrix." By the use of normal faculties, the trustees should have realized

that the stock was an imprudent trust investment; in the exercise of ordinary judgment, they should have done something about it.

Nor was it meet for the trustees — who between them owned all of the stock of the Corporation — simply to sit back and allow the Corporation to continue holding real property, even though, according to its books, operations resulted in a loss year after year. Prudence on their part and a due regard for the rights of the remaindermen should have indicated to them, after the lapse of a reasonable time, the necessity of converting the real estate into income-producing assets. The testimony of the husband reveals a concern on his part that the neighborhood in which the principal real estate was situated was deteriorating and depreciating for causes other than the then general prevailing economic conditions. However, except for one small parcel of property, the trustees made no effort to sell although their own real estate expert testified that during the period covered by the account there were numerous sales of similar properties in the same locale. That a sales program executed by the trustees with diligence might have involved sales of properties, which were occupied by the husband and by a corporation controlled by him, are circumstances which trustees, indifferent as between life beneficiary and remainderman and equally intent upon safeguarding the interests of both, would not permit to affect or influence their judgment.

Although the decree settling the first intermediate account of the trustees precludes a holding that the duty to convert became imperative during the period covered by that account, the court may nevertheless consider that period in determining the reasonable time allowed to the trustees to effect a sale or conversion. In dismissing the objections interposed by the remaindermen, the courts below have held in essence that the retention during the period covered by the second intermediate account was not unreasonable. Normally, the determination of whether the conduct of a trustee measures up to the appropriate standards of prudence, vigilance and care, is a fact to be found by the trial court. In this case, however, the record contains no evidence from which even the minimal requirements may be inferred. The conclusion is unavoidable, therefore, that the trustees, in failing to take any steps toward converting the

corpus into income-producing assets within five years of the testatrix' death — that is, by the middle of the year 1936 — were guilty of gross negligence as a matter of law.

It has been suggested that the results here obtained were inevitable because the trust corpus consisted of stock of the Corporation. However, although the testimony as to the lack of marketability of the stock remaining was itself inconclusive, the absence of a market for the stock did not make its conversion impossible. Partial liquidation of the Corporation by which the trust would have acquired, in exchange for its stock, a prorata portion of the corporate assets, was a plain alternative and — accepting respondents' view that the stock was in effect unsaleable — the only alternative by which the trust could have been saved. As already indicated, the proof demonstrated that the properties themselves were saleable and could have been converted had they been transferred to the trust in return for its stock. A trustee may not be heard to assert that the corporate form of organization compels an otherwise unjustifiable extinction of the interest of the remaindermen in instances where, by reason of his stock ownership as individual and as trustee, he could have prevented it. Under such circumstances, if an irreconcilable conflict between self-interest and fiduciary responsibility develops, the choice of the trustee is either to subordinate the former or resign; " thought of self was to be renounced, however hard the abnegation." (*Meinhard* v. *Salmon, supra*, 249 N. Y. 458, 468.) As to the plaint that application of that principle results in unfairness to the husband, let it be borne in mind that he voluntarily assumed his trusteeship. He was not obliged to become a trustee, " but, as soon as he does so, he accepts whatever are the limitations, obligations and conditions attached to the position ". (*Gratz* v. *Claughton,* 187 F. 2d 46, 49.)

In thus holding that a duty existed on the part of the trustees to consent to a partial liquidation or dissolution of the Corporation in order to liquidate the stock held in trust, we dispose of any contention that the fiduciary, in his individual capacity, might have vetoed or prevented appropriate action by the Corporation towards that end. He may not use the corporate charter as a shield to protect himself from censure — for, as

has been said, though in a different context (*Matter of Witkind, supra,* 167 Misc. 885, 893), " where as here the fiduciaries control a corporation by the help of the estate stock interest added to the stock interest held personally by one of them they are not disabled to make such accounts and are, therefore, under obligation to do so. There is nothing sacrosanct about a corporation. It is not an impenetrable screen behind which facts may be successfully hidden."

The courts below differed with each other as to whether a trustee has the power and authority to set aside, *out of income,* a reserve for depreciation, and thereby affect and reduce the amount of income available for the life beneficiary. The Surrogate believed that trustees have no such power;[1] the Appellate Division ruled that they have. We do not resolve that difference of opinion, for, in our view, we do not reach that much-mooted question. (See Capron, " Depreciation Reserves, Problem in Trust Accounting ", Address before Probate and Trust Law Divisions of Amer. Bar. Assn., Sept., 1950; Report of N. Y. Law Revision Commission, N. Y. Legis. Doc., 1950, No. 65 [0].) The dispute as to whether a reserve for depreciation may properly be set up bears upon the question of whether depreciation moneys should be deemed principal or income vis-à-vis income beneficiary and remainderman. Where, as in the case before us, the life beneficiary was entitled to have the trustees invade the principal in order that he be assured a specified annual sum, it is immaterial whether the depreciation moneys be considered principal or income. Consequently, if the property had been held by the trustees in their own right, the depreciation moneys would clearly have been available for Mr. Hubbell's use. And, under the facts of this case, the cir-

---

[1] It was the Surrogate's conclusion, however, that the remaindermen, in any event, suffered no injury, because, even without a deduction for depreciation, the corporate income was never large enough in any year to pay the beneficiary his guaranteed $10,000 a year. That being so, the Surrogate reasoned, it followed that the sale of stock "was inevitable in any case" to satisfy the requested invasions; that such sales would, as the years went by, necessarily and progressively decrease the amount of income on hand; and that an ever-increasing quantity of stock would have to be sold to make up the difference between such income available for distribution and the $10,000.

cumstance that the real property happened to be owned by a corporation cannot affect the result or require a different conclusion. The Corporation appears to have been largely a mere convenience rather than a true operating entity. It was wholly owned by the trustees in one or another capacity, and, as already observed, they were not privileged to take such corporate action as would result in benefit to one stockholder — the individual Hubbell — at the expense of, and to the undoubted detriment of, the other stockholder — the estate.

It must be presumed that the proper management of the Corporation's affairs did not require the retention of the fund that had been denominated a reserve for depreciation, for, if it did, it would follow that the officers acted improperly in reacquiring the stock. Whether there was a surplus permitting a distribution to stockholders, is perhaps not free from doubt, but it is exceedingly clear that, if the trustees-directors had earlier employed that same business acumen or ingenuity which evolved the 1944 device of creating a book surplus by changing the par value of the capital stock of the Corporation from no par to a par value of $100, that doubt could have been removed and a surplus produced.[2] Such a distribution might well be considered a liquidating dividend from the standpoint either of the Corporation (Ballantine on Corporations [1946], pp. 638–639) or of the trustees. (Cf. *Matter of Osborne,* 209 N. Y. 450.) But that is precisely the kind of partial liquidation which the trustees were under a duty to consider, in order to alleviate the dire consequences resulting to the trust from the invasion of principal following Mr. Hubbell's demands.

In short, the trustees-directors were free to choose whether to use the depreciation moneys for the purpose of acquiring the stock or for the purpose of making a ratable distribution to the stockholders. In making that choice, they were required to act with due regard to the interests of all of the beneficiaries; they were under a duty to refrain from that course of conduct which would, at the expense of other beneficiaries, benefit that

---

[2] As a matter of fact, the trustees-directors do not claim that there was no surplus prior to such recapitalization because, as they themselves recognize, the purchases of stock from the estate, which they caused the Corporation to make, would have been illegal if there had been no surplus (Penal Law, § 664, subd. 5).

beneficiary who also happened to be a trustee and director.

Reaching, then, the conclusion that, in any event, and at the very least, the depreciation moneys were available as a source of payment to the husband on account of his annual " guaranteed " stipend, we cannot accept the Surrogate's decision that the failure of the trustees-directors so to apply them was immaterial and had no effect upon the end result. If the price paid for the stock was no more than its fair value, and there is no finding to the contrary, then there was no basis for the holding that no harm was done to the remaindermen. Obviously, the number of shares to be sold — and the quantity becomes a mere matter of arithmetic — would necessarily be diminished if a portion of the earnings before depreciation, aggregating $77,840.18 over the ten-year period, had been distributed to the life beneficiary before resorting to a sale of the shares to make up the annual deficiency.

The order of the Appellate Division should be reversed, with costs to appellants payable out of the estate, and the matter remitted to the Surrogate's Court for further proceedings not inconsistent with this opinion.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FROESSEL, JJ., concur.

Ordered accordingly.

