S. Samuel Di Falco, S.
This application to reargue the prior decision of this court (N. Y. L. J., July 17, 1961, p. 6, col. 8) is granted and upon reargument that decision is withdrawn. In this proceeding the surviving successor trustee requests a construction of decedent’s will in respect of the apportionment of the proceeds of sale of alleged unproductive shares of stock. The testator died on July 16, 1931, and his will, dated February 28, 1930, was admitted to probate. The testator created a trust of his residuary estate for the benefit of his only son. One third of the corpus was directed to be paid to the income beneficiary when he attained the age of 40 years, and upon reaching that age in 1945, that share was paid to him. Upon the' death of the income beneficiary, the remainder of the trust was directed *39 to be paid to his descendants, and in default of issue, a specified sum is to be paid to a brother-in-law and the balance to specified educational institutions. The income beneficiary was one of the original trustees. He died on May 21, 1960, without issue. The specified sum has been paid to the individual legatee. The property allegedly unproductive, or more properly, underproductive, consists of shares of stock of International Business Machines Corporation, Electric Bond and Share Company, and Felmont Petroleum Corporation (formerly American Maracaibo Company). They constitute a substantial part of the corpus of the trust. The executrix of the income beneficiary joins the surviving trustee in urging that there should be an apportionment of the proceeds of sale of such securities. Two universities which will participate in the remainder contend that there should be no apportionment. They argue that the rule of apportionment of unproductive property does not apply to this property, and that in any event, the estate of the income beneficiary is estopped because he acted as a cotrustee of this trust from its inception until its termination.
Upon reargument this court’s attention is directed to certain facts not emphasized originally relating to the question of estoppel. The beneficiary trustee actively participated in the management of this trust fund. Pursuant to the will he received one third of its corpus during his lifetime. There existed the possibility of lawful descendants and the vesting of the remainder in them. Moreover, upon default of lawful descendants, scholarship funds are to be named for the beneficiary and his father. The beneficiary thus was not wholly disinterested in the execution of the charitable gift. The will authorized the retention of investments owned by the testator and to the date the trust was terminated, these securities were retained by and with the approval, not passive but active, of the beneficiary trustee. The securities were readily salable in the open market, and the trustees could at any time have joined in a sale of these securities and an investment in others with a greater yield. This was not a case where the market did not fairly reflect the value of the stock and the trustees felt impelled to await a more fair opportunity for sale. The securities could have been sold at almost any time in this long period for their reasonable value. Whatever motivated the trustees, they refrained from disposing of the shares.
The will does not give the life beneficiary any interest except in the income of the fund and the share of the corpus which has been paid to him. The right of such a trust beneficiary to an allocated portion of the proceeds of sale of unproductive prop *40 erty arises only in cases where the trustee had been under a duty to sell the unproductive property and had been unable promptly to do so. It is the delayed execution of the duty which gives rise to the right to allocation of the proceeds. The principle is well stated by Professor Scott: “ He [the trustee] is justified in delaying the sale until he believes that he can secure an adequate price. The real importance of the existence of a duty to sell is not in making the trustee liable for failure to sell, but in giving the beneficiary entitled to income a right to a part of the proceeds when ultimately realized by a sale of the property.” (3 Scott, Trusts [2d. ed.], p. 1877.) It is significant in this ease that at no time did the deceased trustee ever advance the contention that the securities were unproductive, that there was a duty to sell them, or that he would ever claim any right to share in the proceeds of sale when they were sold. The claim is asserted for the first time after his death. Moreover, it is not claimed that these securities were at all times totally unproductive. Indeed, in respect of one of them, the claim is that it was unproductive only between the date of the testator’s death and December 31, 1946 and the beneficiary’s estate asks no apportionment for the later period during which it was satisfactorily productive.
It should be noted also that there had been three prior accountings which had the cumulative effect of judicially settling the accounts from July 16, 1931 to June 15, 1957. The existence of a duty to sell these shares was never raised in any of these proceedings. To say now that there had existed a duty to sell during all these past 30 years, is to say that the beneficiary trustee continuously and deliberately violated that duty, because a sale could have been made at any time in the open market, and, insofar as this record shows, there was no reason or justification for delaying sale. The personal representative now asks the court to compensate him for this breach of his asserted duty.
The court must not be understood as saying that there was in fact a duty to sell these securities. What it does say is that unless there was some duty to sell these securities there is no basis for an apportionment of the proceeds of the “ delayed sale ”, that the beneficiary’s claim must be predicated upon the existence of a duty to sell, and that, if we assume existence of such a duty, nothing stood in the way of its discharge except the act or omission of the trustees. It is axiomatic that fiduciaries, ‘ ‘ whether executors or trustees, are under a duty profitably to employ funds in their hands under penalty of personal liability for their neglect. * # * As a corollary to that *41 general duty — to employ the estate’s assets profitably — there arises the further duty to sell or convert unproductive assets and reinvest the proceeds.” (Matter of Hubbell, 302 N. Y. 246, 255-256.) A fiduciary may be personally surcharged for breach of his duty to keep the trust funds invested (Matter of D’Espinay-Durtal, 4 A D 2d 141), but a cofiduciary, who is also a beneficiary and who concurs in the acts of the other fiduciary or assents to them with adequate knowledge of what is going on, is estopped from objecting to the transaction thereafter. (Matter of Niles, 113 N. Y. 547, 559; Matter of Collins, 178 Misc. 521.) He cannot profit from his own default or neglect. He cannot hold his cofiduciary responsible. He cannot compel the remaindermen to compensate him for his own failure to carry out his trust duties (assuming, of course, that there was such failure). Under such circumstances, the trustee beneficiary is not entitled to participate in the proceeds of the ultimate sale of these securities.
The proceeding is entitled as one to construe the will of the testator. Nothing in the text of the will expresses an intention on the part of the testator that his son was to share in these principal assets, or furnishes a basis for implying such an actual intent. The court is asked to imply such an intent from the fact that the beneficiary was the chief object of the testator’s bounty and that1 ‘ the gift of income to him is not to be rendered illusory by the failure of the trust asset to yield a fair income thereon.” There is nothing in the will, however, which required the trustees to retain any particular asset. There is nothing in the will which gives the income beneficiary any right to participate in the proceeds of sale of the principal assets. What the petitioner’s argument really comes down to is an appeal for adjustment of the interests of income and principal in a case where the income yield has been relatively low and the capital gains are unusually high. The adoption of any such rule of equitable adjustment would so complicate trust administration as to rob it of many of its benefits and advantages.