In the Matter of the Estate of VERA SHEINMAN, Deceased.

Surrogate's Court, New York County, November 22, 1966.

*Alfange & Friedman* for temporary administrator. *Richard S. Forman* for petitioner. *Sidney Schutz* for Yeshiva University.

S. SAMUEL DI FALCO, S. The temporary administrator, who served from the date of the issuance of letters (June 28, 1963) to the date of the appointment of the administrator *c. t. a.* (January 30, 1964), is seeking the judicial settlement of his account. In addition to requesting commissions based upon valuations substantially higher than those fixed in the tax proceedings, he requests the allowance of large sums for additional services said to have been performed by him and his wife. These requests are opposed by the administrator *c. t. a.* and by Yeshiva University, the residuary beneficiary.

The gross estate, as finally determined in the New York State estate tax proceeding, is valued at $150,490.25, inclusive of real estate which is valued at $5,000. Items of tangible property which have been appraised at $38,927.32 in the tax proceeding have been valued by the accounting temporary administrator for commission purposes at $103,638.55. In addition to commissions on the higher valuations, the temporary administrator asks the court to allow him the sum of $7,830 for additional services and to allow his wife $7,280 for services rendered by her at his request. He was never authorized by any court order

to employ his wife and he now seeks such authority *nunc pro tunc.*

*Services in packing, unpacking and inventory items.* The decedent had been engaged in buying and selling art properties from approximately 1956 to the time of her death. She apparently had no regular place of business. She travelled frequently to Europe, made purchases there, and had the objects sent to her home or to a warehouse in New York. She dealt generally in antique china, vases, lamp bases, silver, paintings, etchings and antique furniture. After her death there were found in her apartment some trunks, cases and cartons. Annexed to the account is an appraisal by a firm of appraisers and auctioneers, of which 21 pages consist of furniture, furnishings and property found at her apartment, and appraised in the total sum of $11,438. The temporary administrator values the same property in the total sum of $53,541. For services in unpacking, sorting and inventorying these items, the temporary administrator seeks $6,250 for himself and $6,250 for his wife. It will be noted that the total sum requested is greater than the appraised value of · the property and is more than 23% of the greatly increased valuations placed upon the property by the temporary administrator.

The temporary administrator is a registered pharmacist. He claims also to be an expert on objects of art, by reason of visits to museums, galleries and auction rooms, the reading of many books on the subject, and the purchase of many objects of art during the past quarter of a century. He testified that between July 8, 1963 and February 10, 1964, he and his wife attended the apartment 110 times, and that each spent 1,250 hours on the work, a total of 2,500 hours. One reason stated for the great amount of time required was that the packages were well secured and that each item was packed with a large quantity of protective covering. An expert called by the temporary administrator to testify on the value of art objects and antiques was also questioned on the unpacking of such objects. He estimated that it might take 10 days for 4 experienced people, working 6 hours a day, to unpack objects such as those listed in the inventory. This estimate would involve only 240 hours. More than 10 times that number of hours is alleged to have been expended here in the unpacking and inventory. The temporary administrator contends that the service is worth $5 a day, and on that basis he is requesting a total of $12,500 for himself and his wife.

No one but the temporary administrator could give any evidence of the particular objects that were packed and those that

were open and visible. Patently some of the items are the furniture and furnishings of the apartment, and not all of them could have been packed in cases. It is significant that in a petition verified on September 13, 1963 (which sought, among other things, permission to retain the apartment for storage of the items), the temporary administrator alleged: "*Several* of these antiques and objects of art, at the time of my appointment as Temporary Administrator herein, were packed in crates and trunks which had been unopened. * * * and it would be very costly to *repack* the antiques and objects of art in cases because of the nature of such merchandise". At that point of time, according to an exhibit introduced by him in the pending contest, he and his wife had each spent over 400 hours in unpacking and inventorying and were to spend some 800 hours thereafter. Yet he mentioned to the court only the cost of *repacking* them. He alleged in the same petition that the retention of the apartment was necessary, "at least for a few additional months, during which time your petitioner will be able to complete the making of an inventory of the possessions in the said apartment and arrange for an appraisal, pursuant to an order of this court and thereafter sell such property at one of the better auction galleries in the City of New York." There was not one word in that petition of the tremendous job of unpacking which was detailed at the hearing. There was mention of making an inventory but no suggestion that the task could take anything like 2,500 hours.

A temporary administrator is merely a conservator of property of the decedent. His duty, as defined by statute, is "to take into his possession personal property; to secure and preserve it; and to collect choses in action; and, for either of these purposes, or for the purpose of determining the title to personal property in his possession, he may maintain any action or special proceeding." (Surrogate's Ct. Act, § 127.) To perform other actions, he is required to seek authority from the court. He has no authority to disburse any money or to impose any liability on the estate without an order of the court.

In *Matter of Popp* (123 App. Div. 2, 4, 6), the court reiterated the general rule that a fiduciary can be allowed compensation above the statutory rate only for services which were apart from and wholly outside his office, and it added: "It is not enough that he does something for the estate which he has the right to employ another to do and pay him for out of the estate. That is not a test; on the contrary, it must be something which does not come within the province of his office at all, either for him to do personally or employ another to do for the estate.

\* \* \* It is of great importance that the rule be not departed from. Once relaxed, the asking and giving of extra compensation would grow apace and become an intolerable abuse." Former Surrogate (now Mr. Justice) Witmer quoted with approval the statement of the rule from *Matter of Popp,* and said: "In this connection, it may be observed that human nature is such that a fiduciary might ask compensation for services rendered, if allowable, although as a business proposition he would not employ another to perform such services for the estate at the same rate." (*Matter of Hayes,* 102 N. Y. S. 2d 111, 113.) Professor Scott expresses somewhat more baldly the same fear: " The danger is that if he is entitled to compensation he will be tempted to create a job for himself in order to secure the compensation. Even though there is a real necessity that the extra services should be rendered, he would be tempted to employ himself even though another person might render better service." (3 Scott, Trusts [2d ed.], p. 1934.) The danger was also adverted to in *Matter of Tuttle* (4 N Y 2d 159, 168) which emphasized, as does Professor Scott, the necessity of vigilance on the part of the courts.

*Matter of Hayes* (*supra*) involved services of an administratrix in cleaning, mending and repairing property in preparation for sale at auction. A third person had performed similar services and was paid out of the estate. Judge Witmer pointed out that the administratrix would have been justified in employing another to do the work which she did, but he ruled that the administratrix was not entitled to extra compensation, the work being of a character which was not outside the province of her office. In the pending case, the making of an inventory was wholly within the scope of the duties of the temporary administrator. The temporary administrator, in his testimony, and the attorney for the administrator *c. t. a.,* in his affidavit of services, both agree that the making of an inventory in this estate was required. In view of the decedent's method of doing business, some examination of the property was undoubtedly required in order to enable the fiduciary and his counsel to pass upon some of the claims that were being made and to determine whether the estate had claims against others for property paid for by the decedent and never delivered. To the extent that the duties of the temporary administrator required him to make an inventory or examination of the property, he is not entitled to compensation for that service beyond that fixed by statute for the performance of his official duties. The hours allegedly devoted to this work and the type of service allegedly rendered in relation to other matters, indicate a finicking attention to detail and a

needless repetition of operations. To the extent that the fiduciary performed unnecessary and needless services, he is not entitled to compensation at all. The purpose of the preliminary inventory would limit its scope. The cost of this alleged operation would be so great as to frustrate its aim and purpose.

It may very well be that a fiduciary is sometimes justified in employing a laborer to assist him in some of the heavier work in preparing for an inventory. He might sometimes be justified in employing a specialist in handling antiques, although a temporary administrator would have no authority to incur such an expense without advance court permission. Obviously the temporary administrator did not employ his wife in heavy chores and he himself claims to be the expert. It is not clear to what extent she was doing the work which the temporary administrator was under a duty to perform, to what extent she was doing preparatory work, and to what extent such work was necessary. In the petition for permission to make various disbursements wherein the petitioner referred to his making an inventory, there was not a word of disclosure of the hours now alleged to have been spent by his wife under an expectation of payment. The entire cost of the official appraisal of all property, including the making of the report, was only $1,215, while the wife is here requesting $6,250 for assisting in the preliminary inventory.

The employment of his wife by the temporary administrator was unauthorized. In view of all of the circumstances and in view of his failure to disclose these matters in his prior petition, the present application for permission to pay her for such services, is denied.

*Translations.* In the course of examining the personal effects of the decedent, a quantity of correspondence, records and bills were discovered to be in the French language. The temporary administrator states that he is qualified to translate from French into English not only because of his knowledge of the language and currency, but also because of his knowledge of and experience with antiques generally. He translated a large number of papers and documents, expending 70 hours in the task. He values his services at the rate of $10 an hour, and he asks extra compensation of $700. He says that he dictated an English translation of each of the documents to his wife, who afterwards typed the documents in English. She states that she spent 121 hours in this and other secretarial work and requests compensation of $480.

It was undoubtedly of assistance to the temporary administrator in the discharge of his duties that he could readily understand all of the French documents and papers. In examining

the letters and documents to ascertain whether he should take further steps to secure property or to institute proceedings to recover it, the temporary administrator was required only to acquaint himself with the contents of the documents. He was not required to have them all translated into English in permanent form. A temporary administrator who examines the papers of the decedent in order to ascertain whether his duty requires him to take further action is not entitled to charge compensation for reading the documents. If the fiduciary is expert in the use of a foreign language, it is no more difficult for him to read documents than for the representative who examines papers written in the English language. It is true that if the temporary administrator did institute a proceeding in which these documents might be offered in evidence, he would be required to obtain translations acceptable in evidence. There was no need, however, in this case for preserving all of the translations in permanent form. At the hearing he produced a whole file of material which represented his translations and his wife's typing. Apparently the material was not of such importance that it had to be in the hands of the estate representative. There is nothing in the record to indicate the need of this extensive work of translation and typing. The application of the temporary administrator for extra compensation for translations and the application of his wife for stenographic services is denied.

The wife of the temporary administrator includes in her claim other stenographic services in relation to correspondence which the temporary administrator had with other persons respecting the estate. The temporary administrator was not authorized to retain a secretary or stenographer, and he was not authorized to incur such an expense. If the temporary administrator was required to correspond with other persons as part of his official duties he is compensated by his commissions. As the courts have so frequently pointed out, if a fiduciary is unwilling to assume some of the ministerial burdens of his office, he may employ others, sharing his own compensation with them.

*Services abroad.* By order dated October 8, 1963, the temporary administrator was authorized to travel to France for the purpose of collecting assets of the decedent, and he was authorized to expend the sum of $2,000, subject to accounting therefor. He made the trip and has accounted for expenses which total $2,000.47. No objection is made to the account although it is patent that there are many personal items unconnected with his fiduciary business. Property of the decedent was stored at the Hotel Ambassador in Paris in several trunks, cartons and packages. The temporary administrator and his wife proceeded to

unpack each of these containers and to make an inventory of the contents. They then repacked them and forwarded them to a shipping firm in Paris, where they were again unpacked by the temporary administrator and his wife. The shipper packed them for shipping and sent them to New York. Other property was held by a firm in Paris. Each of the cartons held by this firm was unpacked, inventoried, repacked and sent to the shipper. The shipper was paid for packing and forwarding the property to New York. The temporary administrator requests compensation at the rate of $5 an hour for 27 hours, expended by him in this work and 20 hours expended by his wife, a total of $135 for himself and $100 for his wife.

The temporary adminstrator was authorized to travel for the purpose of securing possession of these articles of property. In view of the services rendered by a professional shipper, the services performed by the temporary administrator and his wife were unnecessary. To the extent that the temporary administrator felt obliged to examine the property before delivering it to the shipper, he was to that extent performing his official duties. He had no authority to employ his wife as his assistant. It is obvious in this situation, as in the others, that the work that was done was greatly in excess of that which the interests of the estate required. The requests for compensation are denied.

*Services after probate of will.* The temporary administrator and his wife were present at the decedent's apartment when the appraisers made their inventory and valuation and again when the appraisal was made at the warehouse where the property from France had been sent. They claim that each worked 34 hours during the appraisal at the home and 32 hours at the warehouse. Each asks $330 compensation. The temporary administrator claims that he was requested to be present and to assist at the inventory and appraisals. The appraiser for the estate testified that the temporary administrator wanted a receipt for each of the hundreds of items that he had listed on his own inventory, and that the estate appraiser was thus required to check items against the private inventory of the temporary administrator in order to give him the receipt. At this point of time he was not a fiduciary, and he was not employed by the estate or by anyone authorized to contract for additional services on behalf of the estate. It may very well be that his attendance was necessary for his own protection. Indeed a letter sent by him to the attorneys for the administrator *c. t. a.,* in relation to the property at the warehouse indicates that he was thinking in terms of his own protection, for he wrote that

he expected to be notified when the merchandise was appraised "so that I can be present, as I am responsible for this Estate merchandise."

The appraiser testified that the method of appraisal which the former temporary administrator required had served to extend rather than to shorten the work of the appraisal. In any event, the administrator *c. t. a.* had retained a competent firm of appraisers and obligated the estate for payment of its services. The former temporary administrator was not retained to perform services for the benefit of the estate, and his claim and that of his wife for such compensation are disallowed.

A further claim is made for services in discussing with the representative of an insurance company the estate's claim for loss from breakage and shortages with respect to the property shipped from Paris. The temporary administrator requests $25 for such services. He was asked to confer with the insurer because he was the fiduciary in office when the property was shipped and he had been sent to Paris at estate expense to collect that property. The fact that he was no longer the estate representative would not justify him in refusing to discuss the matter with the insurer. He was not yet discharged from full liability and it was his duty to confer with the insurer on the property which had been shipped from Paris. His commissions are based, in part, upon the property collected there. His claim for extra compensation for such services is disallowed.

A further claim is made for compensation for services relating to the claim of Andre Seilanian, who resided in Paris. It is said that he had a claim against the estate and that he was also interested in purchasing certain of the decedent's jewelry. The temporary administrator knew the claimant. He conferred with the claimant and transmitted the claimant's offers to the attorneys for the administrator *c. t. a.* It was not disputed that the temporary administrator had transmitted certain offers which the estate had not accepted and that he transmitted the offer which was accepted. The attorneys for the estate contend that he was acting for the claimant although there is no suggestion that he received any compensation from the claimant. A letter which the accounting party offered in evidence, in support of his argument that he was asked to act on behalf of the estate does not evidence a request for the performance of services beyond that which the temporary administrator was required to perform. That letter outlined Seilanian's claim to specific items of jewelry and stated that the inventory did not indicate the possession of such items of jewelry by decedent. The letter asked only that the former temporary administrator inform the attorney

" whether you have any information or papers which would show that the said jewelry purchased from Mr. Seilanian was sold by your sister and if so, to whom, and the purchase price ". Inasmuch as the temporary administrator had certain of the decedent's correspondence, the request for information was not without justification. There is nothing in the record to indicate that the former temporary administrator was retained to dispose of jewelry on hand or to adjust the claim of Seilanian in respect of other jewelry. Petitioner asks $375 for his services and $120 for the services of his wife who, it is alleged, was present at most of the negotiations and contributed to its successful conclusion. The necessity for her particular services is not at all evident. The former temporary administrator was a member of the decedent's family and had known the claimant. He was not requested to perform services for the estate. He acted voluntarily as an intermediary in transmitting offers to the estate. Under the circumstances there was no basis for the estate representative, or its attorney, to infer that he was acting as a sales agent. On the contrary he appeared to be acting on the claimant's behalf. In any event there is no basis for finding that he is entitled to compensation for his services. The claim of his wife is wholly without foundation.

The further claim of the temporary administrator is in relation to merchandise which was alleged to have been purchased by Harry Kratzer, an art dealer, and which had not been delivered to him and property which he was alleged to have taken on consignment. The accounting party testified that one of the attorneys for the administrator *c. t. a.* made an appointment for him to meet Kratzer and that he rendered services in the matter after his term as temporary administrator had expired. What is characterized as a request of the attorney is set forth in a letter which explicitly refers to a letter dated May 7, 1964, written by the former temporary administrator to the administrator *c. t. a.* That letter referred to memos in " *my* Kratzer file " memos which " are lengthy and involved ". He suggested a meeting with Kratzer " at which I could be present and at which time I would contribute the necessary explanation and clarification ". This letter was written by a former estate fiduciary who had records which required clarification by him. In accepting his offer to assist in clarifying an estate matter, the estate was not retaining him to perform services beyond those of a fiduciary.

The court accordingly denies in all respects the requests for additional compensation.

*Commissions.* The commissions of the estate representative are to be based upon a valuation of the property which is " to be determined in such manner as the surrogate may direct " (Surrogate's Ct. Act, § 285, subd. 2). The receiving commissions are usually based upon the value of the property as fixed in the New York estate tax proceeding as the date of death value. *(Matter of Hoff,* 186 Misc. 684, 686, affd. 270 App. Div. 891, affd. 296 N. Y. 650; *Matter of Baldwin,* 157 Misc. 692, 697, affd. 250 App. Div. 767.) The rule is based, as Surrogate FOLEY said, " upon convenience and economy ", and avoids additional and expensive reappraisals. *(Matter of Hoff, supra.)* The court may, nonetheless, fix such valuations as justice demands in a particular case.

With one exception, the evidence does not justify fixing any value other than the value placed upon the property by the appraisers and by the taxing authorities. The temporary administrator called an expert witness who never saw any of the property, but who testified on the basis of the list made by the appraiser and information set forth in a hypothetical question. His opinion was that " a fair estate value " for the property " would be in the area of $50,000." He was asked whether his estimate would differ if the valuation were made on the basis of retail sale value rather than for estate purposes, and he said that " value as I again think of it is in the area of estate appraisals about a third of a fair retail value and somewhat less also than a wholesale value." He testified that under " the natural conditions of forced sale, auction sale or sale in various manners, we find that the value of an estate is quite different from the value, either what was paid for the material or what is realizable if it is sold carefully over a period of time." He was asked to assume a case where there would be no conditions of forced sale and where the items of property could be sold at retail in the open market and he was asked to state the value on such a basis. In his opinion, " A wholesale value would be half of retail in theory. Again I am dealing with a theoretical list or a list that I am assuming is correct, as far as I know, the wholesale price would be in this case half. I can see the wholesale value $75,000 and a retail value would be $150,000."

The valuation of $50,000 is more than the appraisal price of nearly $39,000 and less than the temporary administrator's valuation of more than $100,000. In view of the actual sale of some of the property, the difference between that expressed by the expert witness and that fixed by the appraiser is not of great consequence. An estate representative is not expected to open a retail store and dispose of the items singly to different buyers.

The Federal Tax Regulations provide that the "fair market value of the decedent's household and personal effects is the price which a willing buyer would pay a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." (Federal Tax Regulations, § 20.2031-6, subd. [a]; Code of Fed. Reg., tit. 26, § 20.2031-6, subd. [a].) In an estate where there are personal effects "having marked artistic or intrinsic value of a total value in excess of $3,000 (e.g., jewelry, furs, silverware, paintings, etchings, engravings, antiques, books, statuary, vases, oriental rugs, coin or stamp collections), the appraisal of an expert or experts, under oath, shall be filed with the return." (*Id.*, subd. [b].) New York State follows the Federal Rules and Regulations in fixing estate tax valuations. (Tax Law, § 954.)

In a fair estate tax appraisal there can be no difference between the valuations set forth for estate tax purposes and those which a dealer or any other willing buyer would pay a willing seller, neither being under any compulsion to buy or sell. It may very well be that an appraiser selected by the estate representative would subsume conditions of sale most favorable to the estate but if he is a person of integrity he will not fix values to which he is unable to attest under oath or which would reflect upon his status as an appraiser. The appraisers who examined every item attested to the values stated in the appraisal.

It was established at the hearing that the administrator *c. t. a.* distributed the property in kind to the residuary legatee and that the latter sold a part of the property to a dealer for $18,000. The property could not be identified in detail but was described generally as " All the personal property contained in Apt. 11-C at 270 Riverside Drive N. Y. C. * * * With the exception of the certain items removed in the presence of [the buyer]." All of the property in the apartment was originally appraised at $11,438. The buyer could not detail the property excluded from the sale. " There were a lot of lamps. They were all put in a closet and put away and were taboo as far as I was concerned; I wasn't to go near it. I wouldn't touch it. We never took a count, never looked at it. It was jammed in the closet."

It is patent that this property did not either increase or decrease in value between the date of death and the date of sale, and that the value of the property in the apartment was at least $18,000. It would have a further value in the sum of the appraised value of the items excluded from the sale, but unless those items can be identified, there is no basis for fixing such further value. However, it should be noted that in com-

puting commissions on property which had been pledged to secure a loan, commissions may be computed only on the net amount collected by the fiduciary, after deducting sums due on the loan. (*Farmers' Loan & Trust Co.* v. *Turner*, 242 N. Y. 240, 243; *Matter of Mills*, 149 Misc. 389, 390, affd. 239 App. Div. 817, affd. 263 N. Y. 574.) Moreover commissions may be computed only upon claims which were collected by the fiduciary and not upon obligations owed to the decedent and not collected by the fiduciary. (Dodge and Sullivan, Estate Administration and Accounting, p. 512.)

There is no proof of valuation of any of the other property different from that fixed in the appraisal. The court directs that for commission purposes the personal property be valued at the prices fixed in the appraisal, except for the property sold to Savoy Galleries, and that such property shall be valued at $18,000.

The reasonable compensation of the attorneys for the accounting party is fixed and allowed in the sum of $5,000. Their disbursements are allowed in the sum of $227.04.